832 F.2d 1516
 24 Fed. R. Evid. Serv. 124
 O. George SPECHT, Jr. and June B. Specht, Plaintiffs-Appellees,
v.
Roger JENSEN, Doug Martin, and Don Owens, Defendants-Appellants,
Pat Tellier and Ken Jacobs, Defendants.
O. George SPECHT, Jr. and June B. Specht, Plaintiffs-Appellants,
v.
Roger JENSEN, Pat Tellier, Doug Martin, Don Owens and Ken
Jacobs, Defendants- Appellees.
 Nos. 85-1457, 85-1533.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 10, 1987.
Rehearing en banc granted in part and judgment, but not
opinion, vacated Feb. 4, 1988.
 
 Theodore S. Halaby and Robert M. Liechty, of Halaby & McCrea, Denver, Colo., for defendants Jensen, Martin and Owens.
 Arthur H. Bosworth, II (Michael J. Peterson with him on the brief), of Bosworth & Slivka, Denver, Colo., for plaintiffs.
 Before McKAY, SETH, and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 George and June Specht, husband and wife, brought this action against Roger Jensen, Dan Owens, and Doug Martin, three members of the Steamboat Springs, Colorado, Police Department.[1] The Spechts asserted claims under 42 U.S.C. Sec. 1983 (1982) and Colorado law arising from the alleged unlawful search of the Specht home and George Specht's office. A jury found in favor of the Spechts, awarding Mr. Specht $151,250 in compensatory damages against Jensen, Owens, and Martin, and awarding Mrs. Specht $76,250 in compensatory damages against Jensen and Owens and $7,500 in punitive damages against Owens.[2] Defendants appeal, asserting that 1) the district court erred in denying their various motions for judgment notwithstanding the verdict; 2) the trial court committed reversible error in its evidentiary rulings; and 3) the trial court erred in denying their motions for a new trial or a remittitur because the jury verdict is excessive. We affirm.[3]
 
 I.
 JUDGMENT NOTWITHSTANDING THE VERDICT
 
 2
 All three defendants moved for j.n.o.v., contending they were entitled to judgment as a matter of law on the state tort claims and the asserted constitutional violations, as well as on the issues of qualified immunity and punitive damages. Upon review of the grant or denial of a motion for j.n.o.v., we must view the evidence and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. Western Plains Service Corp. v. Ponderosa Development Corp., 769 F.2d 654, 656 (10th Cir.1985). In so doing, we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. Brown v. McGraw-Edison Co., 736 F.2d 609, 613 (10th Cir.1984). Accordingly, we must view the record in the light most favorable to the Spechts in setting out the facts presented at trial and in assessing individually defendants' motions for j.n.o.v.
 
 
 3
 The incidents giving rise to this lawsuit involve the attempts of Ken Jacobs,[4] a private citizen, to repossess a computer that had previously been repossessed from Jacobs by the Spechts' son Timothy. Jacobs had obtained a state court order of possession and writ of assistance that directed any sheriff to assist Jacobs in obtaining the computer.
 
 
 4
 The Spechts, who are in their sixties, live in Steamboat Springs. Although Timothy, who was thirty-seven, had not lived with his parents for many years, he had been in business with his father for a time and Jacobs thought the computer might be located at the Spechts' home. Consequently, Jacobs traveled to Steamboat Springs with two friends, Peter Corr and Ken Long. Long, who owned a restaurant, had previously held positions as a law enforcement official. Corr was a Denver police officer on medical leave.
 
 
 5
 Before the trip, Long called defendant Jensen, a supervisor with the Steamboat Springs police department, whom Long had known for several years. Long told Jensen that a friend had a court order and might need some help executing it. Jacobs, Corr, and Long arrived at the Steamboat Springs police station in the early afternoon of Wednesday, February 24, 1982. Jensen, who was just going off duty, told his replacement, Pat Tellier, "to take care of" the three men. Rec., vol. IV, at 70. Jacobs learned the location of the Specht residence at the police station, and he drove there that afternoon with Corr and Long. They were accompanied by defendant Owens, a Steamboat Springs police officer, at Tellier's direction. No one was home and they returned to the police station.
 
 
 6
 Jacobs then obtained the location of George Specht's business office. He, Corr, and Long drove to the office, found no one there, and went back to the police station again. Sometime early that evening, Tellier said he knew the person who owned the building in which Mr. Specht's office was located. Tellier called the daughter of the owner, Dorinda Wheeler, and told her about the court order. She called her brother, Steve Valdeck. Ms. Wheeler and Mr. Valdeck went to the building that evening and met Corr, Long, and Jacobs, who were accompanied by defendant Martin, another Steamboat Springs police officer, at Tellier's instruction. Martin asked Valdeck if he had brought the key. Valdeck asked if he could see the search warrant and Jacobs handed him the order of possession. Valdeck unlocked the building, and they all entered it and went into the reception area that served both George Specht's office and the other building occupant. At least some of the group then went into Mr. Specht's office, the doors of which were closed but not locked, turned on the lights, and looked around. Jacobs used a flashlight to look into the corners. Finding nothing, the men returned to the reception area, looked into a storage closet used by both building occupants, and left.
 
 
 7
 Early the next morning, Long called the police station and requested a police car to accompany them to the Specht residence. Long, Corr, and Jacobs went to the home and were met there at approximately 7:45 a.m. by defendant Owens and an officer-in-training, Gomez. Before approaching the front door, Owens asked Jacobs what powers the writ provided. Jacobs told him that it gave the same powers as a search warrant.
 
 
 8
 Owens then knocked on the door and June Specht answered. Owens asked for Mr. Specht, who was out of town on business. Mrs. Specht told Owens that her husband was not home and asked if she could help him. She asked him in, and the other four men came in uninvited. Jacobs stated that he had a search warrant to seize a stolen computer. Owens and Jacobs both told Mrs. Specht that if she obstructed Jacobs or did not cooperate, Owens would arrest her and take her to jail. She and Jacobs entered into a heated exchange while the men began milling around the kitchen, and living and dining areas. Jacobs and Owens told her several times to cooperate or she would go to jail. When Mrs. Specht stated that she wanted to call her lawyer, Owens told her she had no right to do so unless Jacobs said she could. Jacobs then told her she could not. She finally gave them her son's work phone number and the men left. They had been at the home approximately thirty to forty minutes.
 
 A. Unconstitutionality of the Searches
 
 9
 The Spechts sought damages under section 1983, asserting that defendants' conduct violated their Fourth Amendment right to be free from unreasonable searches. Section 1983 applies to persons who both deprive others of a right secured by the Constitution or laws of the United States, and act under color of state law. See Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1428 (10th Cir.1984). Owens and Martin contend that the Spechts failed to present sufficient evidence that a search of the office or the home had occurred. Alternatively, they contend that they did not violate the Specht's constitutional rights because they were at most negligent in relying on the repossession order to conduct the searches.
 
 
 10
 1. Existence of the Searches.
 
 
 11
 The court instructed the jury without objection that "a search is a visual observation which infringes upon a person's reasonable expectations of privacy." Rec., vol X, at 921. George Specht testified that he closed his office doors and drapes when he was not there, and that he kept confidential business information on his desk. Assuming as we must that such assertions are true, Mr. Specht indisputably had a reasonable expectation of privacy in his office against police intrusions. O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987); see Mancusi v. DeForte, 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). The evidence of the warrantless entry into his office and the activity that occurred there was sufficient to send to the jury the issue of whether this entry and activity constituted a search. Likewise the activity that took place in the Specht home clearly raised a fact issue regarding a visual inspection of that which the Spechts could reasonably have expected to remain private and which they did not voluntarily expose to public view.[5]
 
 
 12
 2. Mental State of Officials.
 
 
 13
 While the instant appeal was pending, the United States Supreme Court held that an injury arising from a state agent's negligent actions does not deprive an individual of life, liberty, or property under the Fourteenth Amendment due process clause. Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) ("mere lack of due care by a state official [will not] 'deprive' an individual of life, liberty or property under the Fourteenth Amendment"); Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (same). In these cases, the Court adopted the position recognized by this circuit at least since Hewitt v. City of Truth or Consequences, 758 F.2d 1375, 1379-80 (10th Cir.1985), that a state official's negligence does not invariably rise to the level of an abuse of power necessary to give rise to a due process violation. Defendants argue here that their negligence in relying on the repossession order cannot violate the Spechts' constitutional rights.
 
 
 14
 Daniels and Davidson involved procedural due process.[6] The plaintiffs contended that negligent torts by state officials constituted a denial of their liberty without due process of law. The Supreme Court disagreed, holding that the plaintiffs' injuries were not compensable under section 1983 because negligently leaving a pillow on the stairs of a prison, as the guard did in Daniels, or failing to respond quickly to a prisoner's written request, as the official did in Davidson, does not constitute the deprivation of a liberty interest protected by procedural due process.
 
 
 15
 This case involves a section 1983 claim arising out of a search of plaintiffs' home and office, not a procedural due process claim. In Daniels, the Court recognized that in any given section 1983 action, the court must determine the state of mind, if any, necessary to violate the constitutional provision at issue. See 106 S.Ct. at 664; McKay v. Hammock, 730 F.2d 1367, 1373 (10th Cir.1984) (en banc). We must therefore determine what mental state, if any, a state official must have in order to conduct an unconstitutional search.
 
 
 16
 The right to be free from unreasonable searches and seizures originates in the Fourth Amendment and is applied to the states through the Fourteenth Amendment due process clause. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Fourteenth Amendment incorporates Fourth Amendment rights); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusionary rule applies to state violations of Fourth Amendment rights). Specifically enumerated constitutional rights found in the first eight amendments are applied to the states in exactly the same fashion that the right is guaranteed against federal intrusion. Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969); see Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (although disagreeing over the existence of probable cause, eight of nine justices agreed that same Fourth Amendment inquiry applies to state and federal action). "The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights....' " Malloy v. Hogan, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 1494-1495, 12 L.Ed.2d 653 (1964) (privilege against self-incrimination applies to states in same manner as to federal government).
 
 
 17
 The Supreme Court has justified this form of incorporation by recognizing that both state and federal criminal justice systems have developed from the same common-law heritage and are in virtually every relevant sense identical systems. Duncan v. Louisiana, 391 U.S. 145, 148-49 & n. 14, 88 S.Ct. 1444, 1446-47 & n. 14, 20 L.Ed.2d 491 (1968). Although the particular genesis of a guarantee of individual liberty does not necessarily dictate the only imaginable way to protect a particular right, the similarity in origin and current practice of the criminal justice systems throughout the country leads to the conclusion that what is fundamental to fairness in the federal system "is fundamental in the context of the criminal processes maintained by the American States." Id. at n. 14. In this case, therefore, we must determine what mental state is necessary to violate an individual's Fourth Amendment rights.
 
 
 18
 The contours of the search and seizure and warrant clauses are not nearly so vague as those encompassed by the due process clause. Cf. Hewitt, 758 F.2d at 1379. The Constitution explicitly prohibits all unreasonable searches and mandates that no warrants shall issue except upon probable cause.[7] As these clauses have been interpreted, a police officer must obtain a search warrant before conducting a search unless an exception to the warrant requirement exists. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); see Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (describing warrant requirement as a "cardinal principle" of Fourth Amendment law); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (post-hoc showing that probable cause existed does not justify warrantless search).
 
 
 19
 The Supreme Court has on numerous occasions delineated the scope of individual Fourth Amendment rights by clarifying the probable cause standard, e.g., Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (refining standard for determining whether probable cause exists to issue a warrant based on informant's tip), and defining exceptions to the warrant requirement, e.g., United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (clarifying search incident to arrest exception to warrant requirement). In these cases, the Court has never implied that the existence of a constitutional violation hinges upon the official's mental state. Instead, the Court has balanced "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); see Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (balancing of individual and state interests is key principle of Fourth Amendment jurisprudence); Michigan v. Summers, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981) (same). In sum, a Fourth Amendment violation occurs when police engage in a warrantless search and no exception to the warrant requirement applies, or when police search pursuant to a warrant not based on probable cause. That the police officer acted in an objectively reasonable (i.e., non-negligent) manner is irrelevant to the existence of a constitutional violation. See, e.g., Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 20
 The mental state of an officer who violates the Fourth Amendment becomes relevant only when determining whether a particular remedy will be available. For example, although the officers conducting the search in Leon violated the defendant's Fourth Amendment rights, 468 U.S. at 904-05, 104 S.Ct. at 3410-11, the exclusionary rule did not apply because the officers acted in an objectively reasonable fashion. Had the police acted unreasonably (i.e., negligently) in relying on the warrant, the exclusionary rule would have prevented the fruits of the search from being introduced into evidence in a criminal prosecution against the individual whose rights were violated. Id. at 921 n. 20, 923-24, 104 S.Ct. at 3419 n. 20, 3420-21. In a section 1983 action, the existence of qualified immunity for police officers who rely on a warrant is determined by an identical inquiry into the objective good faith of the officers. Malley, 106 S.Ct. at 1098; cf. Anderson, 107 S.Ct. at 3039-40 (same rule for warrantless search). In either case, the availability of a remedy (exclusion of evidence or civil damages) involves a totally separate inquiry from that necessary to determine whether a constitutional violation has occurred. See Leon, 468 U.S. at 906, 104 S.Ct. at 3411.[8]
 
 
 21
 Thus, although good faith may shield individual actors from liability in appropriate cases, see Part IC infra., no specific mental state is required to violate the Fourth Amendment. Defendants' argument that no constitutional violation occurred because the officers in this case were merely negligent in relying upon a repossession order to conduct the office and home searches is without merit.
 
 B. Officers' Participation in Searches
 
 22
 Defendants Owen and Martin contend that the evidence of their participation in the searches undertaken by the three private parties is insufficient as a matter of law to impose liability on them under section 1983. We are not persuaded. When a government official affirmatively facilitates or encourages an unreasonable search performed by a private person, a constitutional violation occurs. See, e.g., Booker v. City of Atlanta, 776 F.2d 272, 274 (11th Cir.1985) (police presence, even absent active participation, could provide an intimidating "cachet of legality" establishing a constitutional violation); Harris v. City of Roseburg, 664 F.2d 1121, 1127 (9th Cir.1981) (issue whether police officer did more than merely " 'stand by in case of trouble' " involves factual determination.)
 
 
 23
 The evidence with respect to both Owens and Martin is sufficient to create a fact issue on whether their conduct was such that the searches at issue occurred under color of state law. Martin drove a police car to the office building upon Tellier's instruction after Tellier had asked Dorinda Wheeler to unlock the building. Martin asked Steve Valdeck if he had brought the key. Valdeck testified that Martin's presence had a great effect on his decision to unlock the building because he felt it gave the men an official reason for being there. This evidence supports the reasonable inference that no search of the office would have occurred absent Martin's activity. The evidence of Martin's role in gaining access to the office by lending the authority of the police to the entry was sufficient to permit the jury to find that he was more than a mere peace-keeping bystander. See Booker, 776 F.2d at 274; Howerton v. Gabica, 708 F.2d 380, 382-84 (9th Cir.1983); Harris, 664 F.2d at 1127.
 
 
 24
 The evidence of Owens' activity at the Specht residence is likewise sufficient to allow the jury to find that he actively participated in the search. Owens' threats to take June Specht to jail if she obstructed Jacobs' search for the computer and Owens' statement that she could not call her lawyer without Jacobs' consent support a finding that Owens made an important affirmative contribution to the private conduct. See Booker, 776 F.2d at 274; Howerton, 708 F.2d at 382-84; Harris, 664 F.2d at 1127. Thus, the district court properly denied Owens' and Martin's motions for a j.n.o.v. with respect to their participation in the searches.
 
 
 25
 Jensen argues that he was entitled to a j.n.o.v. because there was insufficient evidence of the required connection between his conduct and the alleged constitutional violations. A supervisor is not liable under section 1983 unless an "affirmative link" exists between the deprivation and either the supervisor's "personal participation, his exercise of control or direction, or his failure to supervise." McKay, 730 F.2d at 1374. The court in this case instructed the jury without objection that
 
 
 26
 "[a] person subjects another to the deprivation of a constitutional right within the meaning of ... section 1983 if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes a deprivation of which complaint is made. Personal participation is not necessary. Anyone who causes any citizen to be subjected to a constitutional deprivation is also liable. Requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the unconstitutional injury."
 
 
 27
 Rec., vol. X, at 920-21.
 
 
 28
 The record here is sufficient to support the jury finding on Jensen's liability under the applicable law. The Spechts presented evidence that when Long called Jensen before the trip to Steamboat Springs and told Jensen that Jacobs might need assistance in executing an order, Jensen said "[s]ure, come on over, or something to that effect." Rec., vol. IV, at 68. When Long, Jacobs, and Corr arrived at the police station, Jacobs showed Jensen the order and Jensen told Tellier to "take care of" them. Id. at 70. In response to Jensen's instruction, Tellier assigned police officers to accompany the men to the Specht office and home. This evidence is sufficient to raise a fact issue as to either Jensen's personal participation in, or control or direction of, the events culminating in the alleged injuries. Cf. Miller v. City of Mission, 705 F.2d 368, 375-76 (10th Cir.1983) (upholding imposition of liability on council members who participated in wrongful termination decision). Thus, the district court properly denied the motion by Jensen for a j.n.o.v. with respect to his role in providing police participation in the searches.
 
 C. Qualified Immunity
 
 29
 Defendants contend that they were entitled to a j.n.o.v. on their claim for qualified immunity. Government officials performing discretionary functions are entitled to qualified immunity "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson, 107 S.Ct. at 3038. This inquiry turns on "the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 818, 102 S.Ct. 2727, 2739, 2738, 73 L.Ed.2d 396 (1982)). The Supreme Court has pointed out that whether a search was objectively legally reasonable "will often require examination of the information possessed by the searching officials." Id. 107 S.Ct. at 3040. Thus the relevant inquiry "is the objective (albeit fact-specific) question whether a reasonable officer could have believed [defendants'] warrantless search to be lawful, in light of clearly established law and the information in the searching officers possession." Id.
 
 
 30
 The availability of qualified immunity is ordinarily decided on a motion for summary judgment. However, defendants did not move for summary judgment on that ground. Instead, the jury was instructed that defendants were not liable to plaintiffs if the jury found that "(1) the defendant believed at the time of the incident that the action he took was lawful; (2) the defendant held such a belief in good faith, and (3) it was reasonable for the defendant to reach the conclusion he did." Rec., vol. X, at 924. This instruction incorporates the element of subjective good faith that the Supreme Court eliminated from the qualified immunity defense in Harlow v. Fitzgerald, 457 U.S. 800, 815-19, 102 S.Ct. 2727, 2736-38, 73 L.Ed.2d 396 (1982). Although plaintiffs raised the propriety of the content of the instruction with the district court, defendants stated that they had no objection to the instruction as given.
 
 
 31
 On appeal, defendants do not assert that the instruction constitutes plain error. Instead they argue that there was no evidence upon which the jury could have found a violation of clearly established rights of which a reasonable officer would have known. We disagree. Even though Jacobs told Owens that the writ of assistance was equivalent to a warrant, the writ on its face was not a search warrant. Moreover, it was directed to any sheriff rather than to a police officer. These undisputed facts undermine defendants' assertion that their conduct in the face of this information was objectively reasonable as a matter of law. The district court properly denied their motions for judgment notwithstanding the verdict.
 
 D. Outrageous Conduct and Punitive Damages
 
 32
 Owens contends that the evidence is insufficient to support the jury verdict finding him liable on June Specht's claims for outrageous conduct under state law and for punitive damages. Colorado recognizes a cause of action for intentional infliction of emotional distress when the plaintiff shows that:
 
 
 33
 "(1) the conduct is extreme and outrageous; (2) the conduct is intentional or reckless; (3) the conduct causes emotional distress; and (4) the distress is severe. [Citation omitted]. For the conduct to be considered extreme and outrageous, it must 'go beyond all possible bounds of decency and ... be regarded as atrocious, and utterably intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!" ' "
 
 
 34
 Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152, 1158 (10th Cir.1981) (en banc) (plurality opinion) (quoting Rugg v. McCarty, 173 Colo. 170, 476 P.2d 753, 756 (1970) (citation omitted)), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." DeCicco v. Trinidad Area Health Ass'n, 40 Colo.App. 63, 573 P.2d 559, 562 (1977) (quoting Restatement (Second) of Torts Sec. 46 comment h (1965)).
 
 
 35
 As we have noted above, Owens actively participated in the improper search by five men of the Specht home at an early hour when he knew June Specht was alone in the house. He repeatedly threatened to arrest her and take her to jail, and supported Jacobs' refusal to allow her to call her lawyer. This evidence is sufficient to raise a fact issue on the outrageous nature of Owens' conduct. The evidence is equally sufficient to support the award of punitive damages against Owens for conduct in "wanton and reckless disregard of the rights and feelings of [June Specht]." Rec., vol X, at 932.II.
 
 EVIDENTIARY RULINGS
 
 36
 Defendants argue that the trial court erred in permitting a lay witness and an expert to testify as to the legal definition of a search, thereby usurping the province of the court. Defendants also contend that allowing these witnesses to give their opinions on whether a search took place invaded the province of the jury. These are matters committed to the discretion of the trial court, Karns v. Emerson Electric Co., 817 F.2d 1452, 1459 (10th Cir.1987), and we are not persuaded that an abuse of discretion occurred.
 
 
 37
 A lay witness may give an opinion if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony on the determination of a fact in issue." Fed.R.Evid. 701. Moreover, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704.
 
 
 38
 Plaintiffs proposed to ask Long, who had prior experience as a law enforcement officer, whether in his opinion the office building incident constituted a search. Defendants objected on the ground that the question called for a legal conclusion. The court overruled the objection, stating that Long could answer "in his experience how this compared with a search...." Rec., vol. V, at 102. Long was then asked whether, in his opinion, going into the building was a search, and he responded "we entered the building, we did not go in any areas that could not have contained the subject computer, and we didn't go through doors or rummage through the place or anything like that. But within the confines of the purest definition, simply walking with your eyes open is a search." Rec., vol. V, at 103-04 (emphasis added).
 
 
 39
 Although the italicized sentence, which defendants cite as grounds for reversal, was arguably objectionable as not responsive to the question, defendants did not object or move to strike on that ground. The sentence may also have been objectionable as contrary to the court's instruction that Long "answer according to his experience, not to the legal definition." Id. at 103. However, defendants did not object on that ground either. The court subsequently instructed the jurors that they were "to follow the law stated in the instructions of the Court and to apply the rules of law so given to the facts as you find them from the evidence in the case." Rec., vol. X, at 911. Under these circumstances the error, if any, was harmless.
 
 
 40
 Defendants also contend that the court erroneously permitted opinion testimony from plaintiffs' witness Daniel Sears, who was qualified as an expert on the constitutional law of search and seizure and on criminal procedure. Plaintiffs proposed to ask Sears whether, in his expert opinion, the home and the office were subjected to searches and if so whether the searches were illegal. Defendants again objected, contending that this was a legal issue and that Sears would therefore intrude upon the province of the court by giving his opinion. Although the court offered to instruct the jury on the legality of the searches as a matter of law, defendants did not accept the offer. The court then ruled that if the legality of the searches was a matter for the jury to decide, Sears could give his opinion on that issue within the perimeters of the court's instructions on the law. Sears then testified, in response to hypothetical questions adopting evidence most favorable to plaintiffs, that searches had occurred and that in his opinion the searches were illegal. On appeal, defendants contend that Sears' testimony usurped the province both of the district court and of the jury.
 
 
 41
 Experts may give opinions if their specialized knowledge will assist the fact finder to understand the evidence or to determine a fact. Fed.R.Evid. 702. Significantly, as set forth above, an opinion is admissible even though it goes to an ultimate issue to be decided by the fact finder. Thus, to the extent defendants contend that the court erred by allowing Sears to express an opinion on an issue defendants agreed was a jury question, their argument is without merit.
 
 
 42
 Defendants also assert that reversible error occurred because Sears improperly told the jury what law to apply. We disagree. Although it constitutes error to allow a witness to instruct the jury on the applicable law, see, e.g., United States v. Zipkin, 729 F.2d 384, 386-87 (6th Cir.1984); Marx & Co., Inc. v. The Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir.1977), a review of the entire record demonstrates that no such improper instruction occurred here. Defendants pointed out on cross-examination that Sears' opinions were based on his own view of the law, and that Sears did not know what the court's instructions on the law would be. Although Sears agreed that his view of the law in the area of search and seizure could very well differ from that of the trial judge, his definition of an illegal search was essentially the same as the one the judge gave to the jury. Cf. Karns, 817 F.2d at 1459. Sears further stated that the trial court's "understanding of the law is controlling in this case." Rec., vol. III, at 133. In addition to instructing the jury that it must apply the law as stated in the court's instructions, the court also informed the jury that it could determine what weight, if any, should be given to the expert testimony. Under these circumstances, we are not prepared to say that the jury misunderstood its duty to follow the law given by the court or that it gave improper credence to any legal definitions embodied in Sears' testimony. See Karns, 817 F.2d at 1459 (upholding admission of expert testimony on legal issue where " 'jury was [not] prevailed upon to abdicate its function or responsibility for reaching an independent judgment on the ultimate issues....' ").
 
 
 43
 We are not persuaded by defendants' contention that the court committed reversible error by refusing to allow Sears to be cross-examined on his knowledge of specific judicial decisions. The court found that defendants' proposed questioning on particular constitutional cases was irrelevant because it would mean nothing to the jury. "[T]he scope and extent of cross-examination of expert witnesses rests in the sound discretion of the trial court and 'is not subject to exception unless wholly arbitrary, unreasonable and abusive, and the examination need not be extended to permit interrogation about collateral, immaterial or irrelevant matters.' " United States v. 10.48 Acres of Land, 621 F.2d 338, 340 (9th Cir.1980) (quoting United States v. 25.02 Acres of Land, 495 F.2d 1398, 1402 (10th Cir.1974)). Even assuming that such cross-examination was relevant to Sears' credibility as an expert, "it was still within the discretion of the trial court to exclude this evidence if its probative value was substantially outweighed by the risk that its admission would confuse the issues or mislead the jury." 10.48 Acres of Land, 621 F.2d at 340. We agree with the trial court's assessment here that the requested cross-examination would have had no value to the jury. Accordingly, we find no abuse of discretion.
 
 
 44
 Defendants also object to the court's decision allowing evidence of a statement Jensen made to a process server regarding service in this action. Plaintiffs asked Jensen if he had said "we screwed up and now we're in trouble." Rec., vol. VIII, at 704. Defendants objected that the statement was prejudicial, inflammatory, and not probative. The district court ruled that the alleged statement was relevant as an admission against interest and also was probative on the issue of good faith. Rec. vol. VIII, at 693-95. A trial court has broad discretion in determining whether relevant evidence is admissible under Fed.R.Evid. 403. See Higgins v. Martin Marietta Corp., 752 F.2d 492, 497 (10th Cir.1985). We are not convinced the court abused its discretion.
 
 
 45
 When Jensen denied making the statement, plaintiffs called the process server to the stand on rebuttal and he testified that Jensen made the statement to him. Jensen asserts on appeal that this testimony was inadmissible under Fed.R.Evid. 608(b). No objection was made to the testimony at trial, and we will not consider this allegation here. See Fed.R.Evid. 103(a)(1); Fed.R.Civ.P. 61.III.
 
 DAMAGES
 
 46
 Defendants contend that the amount of damages was excessive and that the district court therefore erred in denying their motion for a new trial or, in the alternative, for remittitur. A district court's refusal to grant a new trial motion asserting excessive damages is afforded "considerable deference on appeal." Karns, 817 F.2d at 1460; Blevins v. Cessna Aircraft Co., 728 F.2d 1576, 1579 (10th Cir.1984). Moreover, "absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." Malandris, 703 F.2d at 1168; see also Karns, 817 F.2d at 1460; Aspen Highlands Skiing v. Aspen Skiing Co., 738 F.2d 1509, 1526 (10th Cir.1984), aff'd, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); Blevins, 728 F.2d at 1579.
 
 
 47
 Plaintiffs presented evidence through lay and expert testimony of Mrs. Specht's psychological injury. The Spechts also testified to their change in lifestyle and the resulting loss of their enjoyment in life. Mr. Specht testified that prior to the incidents at issue, he had been president of a company and had traveled extensively because he had been completely responsible for the company's sales in the United States and Canada. After the incidents, his wife was afraid to be left alone, so he resigned as president and retained four small accounts as a sales agent for the company.
 
 
 48
 In view of this largely undisputed evidence of emotional injury and financial loss, we find no ground for disturbing the trial court's refusal to grant a new trial or remittitur. Upon thorough review, the record does not provide an irresistible inference that the verdict amount was the product of passion or prejudice.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 The Spechts originally included as defendants various other public officials and private parties. The disposition of the claims against these defendants is not at issue in this appeal
 
 
 [2]
 June Specht also asserted a state tort claim for false imprisonment against two defendants. The jury decided this claim against her
 
 
 [3]
 Although the Spechts brought a cross-appeal, they asserted at oral argument that they would withdraw it if the judgment were affirmed. In view of our disposition of this appeal, we deem the cross-appeal abandoned
 
 
 [4]
 Jacobs was a defendant at trial and was found liable to the Spechts for violations of 42 U.S.C. Sec. 1983 and state tort law. The jury awarded both Spechts actual damages against Jacobs and, in addition, awarded Mrs. Specht exemplary damages. Jacobs did not appeal
 
 
 [5]
 The jury rejected defendants' argument that Mrs. Specht had consented to the search, and defendants do not raise the issue of consent on appeal
 
 
 [6]
 The phrase "procedural due process" is a term of art used by the federal courts to distinguish among different sorts of individual rights and liberties that the Fourteenth Amendment due process clause guarantees against state action. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 677, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in judgment). A "procedural due process" violation refers to an instance where the state violates the Constitution not in the action that it takes, but in its failure to provide sufficient process to guarantee that the individual is treated fairly. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (meaningful notice and hearing must preceed state seizure of property); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (proof beyond a reasonable doubt required to find an individual guilty of a crime). Conversely, a "substantive due process" violation occurs where the state action itself is unconstitutional regardless of the process extended. Youngberg v. Romeo, 457 U.S. 307, 315, 319, 102 S.Ct. 2452, 2457, 2459, 73 L.Ed.2d 28 (1982) (mental patient admitted under proper procedures retains substantive liberty interests in safety and freedom from bodily restraint protected by Fourteenth Amendment); Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) ("sanctity of the family" is a right protected by substantive due process component of the Fourteenth Amendment); see Daniels, 106 S.Ct. at 665. A third sort of constitutional violation involves those enumerated rights found in the first eight amendments that the Fourteenth Amendment due process clause applies to the states. See, e.g., Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) (First Amendment rights); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Fourth Amendment rights); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (Fifth Amendment compelled self-incrimination clause); Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (Fifth Amendment double jeopardy clause); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to a jury trial); Robinson v. California 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (Eighth Amendment cruel and unusual punishment clause)
 
 
 [7]
 "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
 U.S. Const. amend. IV.
 
 
 [8]
 In Leon, the Court stressed that lower courts may address underlying Fourth Amendment issues before deciding whether the remedy sought is available. Id. at 924-25, 104 S.Ct. at 3421-22 (alleged Fourth Amendment violations "undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate"). This approach is essential to the continued development and articulation of the liberty protected by the Fourth Amendment. See id. at 925, 104 S.Ct. at 3421 ("If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before" deciding whether a remedy exists.)