**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WILLIAM RIECK,

>   Plaintiff - Appellee -
>   Cross-Appellant,

>   v.

SCOTT JENSEN, in his individual and
official capacity as a Utah County
Sheriff's Deputy,

>   Defendant - Appellant -
>   Cross-Appellee,

JAMES O. TRACY, JR., Sheriff of
Utah County; UTAH COUNTY, John
and Jane Doe SWAT officers 1-4, and
John and Jane Does 5-15,

>   Defendants.

No. 10-4110, 10-4119

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:08-CV-00825-BSJ)**

---

Nathan A. Crane (Peter Stirba and Julia D. Kyte, with him on the briefs), Stirba &
Associates, Salt Lake City, Utah, for Defendant - Appellant - Cross-Appellee.

Alyson E. Carter (Robert B. Sykes and Scott R. Edgar, with her on the briefs),
Robert B. Sykes & Associates, P.C., Salt Lake City, Utah, for Plaintiff - Appellee
- Cross-Appellant.

---

Before **HARTZ**, **EBEL**, and **HOLMES**, Circuit Judges.

**HARTZ**, Circuit Judge.

Utah County Deputy Sheriff Scott Jensen appeals the district court's ruling that he was not entitled to qualified immunity on claims brought against him by William Rieck alleging illegal entry, illegal detention, and excessive force. The claims arose out of an incident on Rieck's 17-acre property in an unincorporated part of Utah County. The district court ruled that Jensen was not entitled to qualified immunity because he entered a closed gate to Rieck's property without a warrant. On appeal Rieck has not argued any alternative ground for denying Jensen qualified immunity.

We reverse and remand for entry of summary judgment for Jensen on these claims. The area of Rieck's property that Jensen entered was not within the curtilage of Rieck's home, and Jensen therefore could enter without violating Rieck's constitutional rights. Because our ruling on Jensen's appeal resolves Rieck's cross-appeal seeking to reverse the district court's ruling denying him summary judgment against Jensen on the same three claims, we need not address its merits separately.

I.    BACKGROUND

On November 4, 2004, Jensen drove to the vicinity of Rieck's 17-acre property in response to a complaint that someone was discharging a firearm near the city limits of Lehi City. Jensen claims that upon arriving he heard gunshots

coming from Rieck's property. He parked his police car across the road from the entrance to Rieck's land and called for backup. An unpaved driveway leads from the entrance through a wooded area to Rieck's home. The metal gate at the entrance was closed. A post to the side of the gate supported a mailbox that was topped with a "No Trespassing" sign. One can easily see the driveway through the gate, but trees on either side of the driveway block the view of the interior of the property, and the driveway turns out of view a short distance from the entrance.

While Jensen was awaiting backup, Rieck drove his truck down the driveway to go to the mailbox, a trip of several hundred feet. Rieck stepped out of his vehicle and walked to his mailbox, reaching through the gate to pull down the mailbox lid. Jensen approached him to ask about the shots, but Rieck refused to say whether he had been shooting a gun. Jensen claims that he smelled alcohol coming from Rieck and observed that Rieck had blood-shot eyes. Rieck denied drinking (although in his deposition he admitted that he may have been chewing tobacco to which he had added whiskey). Once Rieck retrieved his mail, he told Jensen that he did not have to talk with him and turned to walk back to his truck. Despite Rieck's protests that Jensen had no right to enter his property, Jensen opened the gate and attempted to stop Rieck. A struggle ensued, during which Jensen sprayed Rieck with pepper spray, accidentally spraying himself in the

process.  Rieck broke free and drove his truck back to his home.  A SWAT team later arrested Rieck there.

Criminal charges were filed against Rieck in Utah state court, but the trial court dismissed the charges on the ground that the entry, detention, and arrest were without justification.  *See State v. Rieck*, 196 P.3d 609, 611 (Utah Ct. App. 2008).  Although the state appealed the dismissal, it did not contest the illegality of Jensen's entry on Rieck's property (it argued only that the dismissal was nonetheless improper), and the Utah Court of Appeals affirmed.  *See id.*

Rieck then filed suit in the United States District Court for the District of Utah against Jensen and others, seeking relief under 42 U.S.C. § 1983 for violation of his constitutional rights and under various state-law causes of action. The defendants sought summary judgment on all claims, and Rieck sought partial summary judgment on his claims against Jensen.  On June 4, 2010, the district court denied Rieck's motion and granted the defendants' motion for summary judgment except on the claims against Jensen for illegal entry, illegal detention, and excessive force.

## II.    DISCUSSION

### A.    Qualified Immunity and Jurisdiction

Rieck has moved to dismiss Jensen's appeal for lack of jurisdiction.  To assess that motion we examine the doctrine of qualified immunity and the consequences to jurisdiction that flow from the doctrine.

Under the qualified-immunity doctrine, government officials are entitled "not to stand trial or face the other burdens of litigation [unless] the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine is intended "to shield [government officials] from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982). Qualified-immunity doctrine recognizes that absent such protection, the "fear of being sued w[ould] dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* at 814 (brackets and internal quotation marks omitted).

The doctrine affects our appellate jurisdiction. Under 28 U.S.C. § 1291 an appellate court can review only a final decision, "generally . . . one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233 (1945). A district-court denial of a summary-judgment motion leaves much (often everything) to be decided, so ordinarily it is not a final decision. *See Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 712 (10th Cir. 2010). But the collateral-order doctrine expands the category of final (and therefore appealable) decisions to include decisions that are "conclusive on the question . . . decide[d], . . . resolve important questions separate from the merits, and [are] effectively unreviewable if not addressed through an interlocutory appeal." *Howards v. McLaughlin*, 634

-5-

F.3d 1131, 1138 (10th Cir. 2011). And the Supreme Court has held that commonly a denial of a motion for judgment based on qualified immunity is such a collateral order, essentially because the denial "finally and conclusively determines the defendant's claim of right not to *stand trial*." *Mitchell*, 472 U.S. at 526–27. There is an exception, however; a denial of summary judgment is not considered a final decision if it "determines only a question of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial," *Howards*, 634 F.3d at 1139 (internal quotation marks omitted).

In this case we may review the district court's denial of Jensen's motion for summary judgment based on qualified immunity because, as we shall see, Jensen's entitlement to qualified immunity is based on undisputed facts. There might also be a question regarding our jurisdiction to consider Rieck's cross-appeal, because the district court's denial of his motion for partial summary judgment is not a final order. *See Utah Animal Rights Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1239 n.1 (10th Cir. 2009). But disposition of Jensen's appeal fully resolves Rieck's cross-appeal, so we exercise pendent jurisdiction. *See Moore v. City of Wynnewood*, 57 F.3d 924, 929–30 (10th Cir. 1995).

Having established our jurisdiction, we now proceed to the merits.

**B. The Merits**

We review de novo the district court's denial of a motion for summary judgment founded on qualified immunity, applying the same standard that the

district court is to apply. *See Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009). The parties have greatly narrowed the issues before us. Rieck presents only one ground for denying qualified immunity to Jensen—namely, that Jensen's entry onto Rieck's property violated the Fourth Amendment (as applied to the States through the Fourteenth Amendment, *see Specht v. Jensen*, 832 F.2d 1516, 1521 (10th Cir. 1987)).[1] Accordingly, our task is to determine (a) whether under the undisputed facts Jensen's entry onto Rieck's property was permissible under the Fourth Amendment, or (b) if not, whether the law to that effect was clearly established at the time of the entry. Because we hold that the entry was not unconstitutional, we need not address the second alternative.

At first blush it may appear that Jensen's entry onto Rieck's property must have been unlawful. After all, the entry was undoubtedly a trespass. *See Sycamore Family, L.L.C. v. Vintage on the River Homeowners Ass'n, Inc.*, 145 P.3d 1177, 1179 (Utah Ct. App. 2006) (defining trespass as "physical invasion of the land" and "encroachment on the rights of another" (internal quotation marks omitted)). Jensen opened a gate with a sign saying "No Trespassing." And he was told twice by Rieck that he had no right to enter the property.

---

[1]In the Statement of Facts in his opening appellate brief, Rieck makes a statement that might be construed as suggesting that Jensen lacked grounds to detain him because no breathalyzer or field sobriety test was performed. But an argument is not preserved by merely alluding to it in a statement of facts. *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 n.4 (10th Cir. 2004) ("Appellees are not expected to respond to every grievance that may be alluded to in the appellant's statement of facts.").

Nevertheless, the Supreme Court has made it clear that the Fourth Amendment does not track property law. Twice the Supreme Court has held that a trespass by law-enforcement officers did not violate the Fourth Amendment. In *Oliver v. United States*, 466 U.S. 170, 173 (1984), two drug agents, acting on reports that marihuana was being raised on Oliver's farm, came to the farm to investigate. After walking on a footpath around a locked gate and various "No Trespassing" signs, they discovered a field of marihuana over a mile from Oliver's house. *See id.* The district court suppressed evidence of the discovery of the marihuana field, noting that Oliver had done all he could to demand privacy and that the "field itself is highly secluded: it is bounded on all sides by woods, fences, and embankments and cannot be seen from any point of public access." *Id.* at 173–74.

The Supreme Court disagreed. It said that Fourth Amendment protection to "persons, houses, papers, and effects" does not extend to open fields. *Id*. at 171 (internal quotation marks omitted). This result comported with the Court's understanding of the amendment as protecting only reasonable expectations of privacy. *Id*. at 187–88. It explained that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id*. at 178. "[O]pen fields," it said, "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no

-8-

societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields." *Id*. at 179. The Court noted that this view was consistent with the common-law distinction between open fields and a home's "curtilage." It defined "curtilage" as "the land immediately surrounding and associated with the home," *id*. at 180, and described it as "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," *id*. (internal quotation marks omitted).[2]

The Court "reject[ed] the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate" and ruled that Oliver's attempts to conceal his criminal activities by planting marihuana upon secluded land, erecting fences, and posting "No Trespassing" signs around the property did not provide Fourth Amendment protection. *Id*. at 182. There was no need for a case-by-case analysis of the privacy efforts by the landowner. *Id*. at 181. "The test of legitimacy," said the Court, "is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id*. 182–83. Thus, the trespass by the drug agents did not violate Oliver's Fourth Amendment rights. *See id*. at 183–84.

---

[2] The Court did not attempt to define the precise line between curtilage and open fields, though it did say that an open field need not be either open or a field. *See id*. at 180 n.11.

The Supreme Court provided further clarification in *United States v. Dunn*, 480 U.S. 294, 296 (1987), which considered whether an area was part of a house's curtilage protected by the Fourth Amendment. Law-enforcement officials investigating whether Dunn and another man were manufacturing controlled substances entered their 198-acre ranch without a warrant. *See id*. at 296–97. They crossed a ranch-style perimeter fence that completely encircled the property as well as several interior barbed-wire fences. *See id*. at 297–98, 304. Approaching a barn, the officials smelled an acidic odor and, without entering the barn, observed what they thought to be a phenylacetone laboratory. *See id*. at 297–98. They later made two similar entries and then obtained a search warrant for the ranch. Dunn challenged the warrant as the fruit of unlawful searches. *See id*. at 298–99.

Following *Oliver*, the Court ruled that the officers lawfully viewed the interior of the barn, because they were not within the curtilage of the house. *See id*. at 301–05. It reiterated *Oliver's* statement that "the central component of [the curtilage] inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* at 300 (internal quotation marks omitted). Then it laid out a four-factor test for analyzing curtilage questions:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the

-10-

steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301.

Each factor supported the Court's ruling. The barn was 60 yards from the house and 50 yards from the fence surrounding the house; "this substantial distance supports no inference that the barn should be treated as an adjunct of the house." *Id.* at 302. The barn was outside the fence surrounding the house. "[T]he law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." *Id.* And Dunn "did little to protect the barn area from observation by those standing in the open fields." *Id.* at 303.

Applying the four *Dunn* factors in this case, we conclude that Jensen's entry did not violate Rieck's constitutional rights. The only part of Rieck's property entered by Jensen during the incident was the portion of the unpaved driveway within a few feet of the entrance gate, and this area was not within the curtilage of Rieck's home.

First, this area is a considerable distance from Rieck's home. The exact distance is not clear, but to get his mail Rieck "drove his truck several hundred feet down his private driveway." Cross-Aplt.'s Second Cross Appeal Br. at 9.

Rieck suggests that the second factor supports his curtilage claim because his property was completely fenced and gated. But this fence around 17 acres is

not the sort of "enclosure surrounding the home" contemplated by *Dunn,* 480 U.S. at 301. After all, in *Dunn*, too, there was a perimeter fence. *See id.* at 297. But the Court focused its attention on the fence surrounding the house itself. *See id.* at 302. If Rieck also had the sort of fence that "serve[d] to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house," *id.*, the area of the incident was well outside it. Whether a fence is "immediately adjacent" to a home may be a close question in some cases, but this is not one of them.

Third, a driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home. And finally, nothing shielded the area from public view. The gate did not obstruct vision. And although trees apparently blocked the view of the house and much of the property, they did not block the area in question from observation by those on the public road.

Thus, the end of the driveway near the gate did not fall within the curtilage of Rieck's home, and Jensen's entry into this area did not violate the Fourth Amendment. Limiting our decision to the issues before us, we hold that Jensen was entitled to summary judgment, and Rieck was not.

## IV. CONCLUSION

We DENY Rieck's motion to dismiss the appeal; we REVERSE and REMAND for entry of summary judgment for Jensen.