FILED
United States Court of Appeals
Tenth Circuit

March 11, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RALPH GENE CARLOSS,

    Defendant - Appellant.

No. 13-7082

---

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:13-CR-00006-RAW-2)**

---

Robert A. Ridenour, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender and Barry L. Derryberry, Research and Writing Specialist, with him on the briefs), Tulsa, Oklahoma for Defendant-Appellant Ralph Carloss.

Linda A. Epperly, Assistant United States Attorney (Mark F. Green, United States Attorney and Kyle E. Waters, Assistant United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee United States of America.

---

Before **TYMKOVICH,** Chief Judge, **EBEL,** and **GORSUCH,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this direct criminal appeal, Defendant-Appellant Ralph Carloss contends that two police officers violated the Fourth Amendment by knocking on his front door, seeking to speak with him. Ordinarily a police officer, like any citizen, has an implied license to approach a home, knock on the front door, and ask to speak with the occupants. Carloss, however, claims that "No Trespassing" signs posted around the house and on the front door of his home revoked that implied license. We conclude, to the contrary, that under the circumstances presented here, those "No Trespassing" signs would not have conveyed to an objective officer that he could not approach the house and knock on the front door seeking to have a consensual conversation with the occupants. Nor did the officers exceed the implied license to knock on the front door by knocking too long. We also uphold the district court's factual finding that Carloss voluntarily consented to the officers entering the house. Therefore, having jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's decision to deny Carloss's motion to suppress evidence that the officers discovered as a result of their consensual interaction with Carloss, after he responded to their knocking.

## BACKGROUND

Ashley Stephens, an agent with the federal Bureau of Alcohol, Tobacco and Firearms, received several tips that Carloss, a previously convicted felon, was unlawfully in possession of a firearm, possibly a machine gun, and was selling methamphetamine. In order to investigate these tips, Agent Stephens, along with Tahlequah, Oklahoma police investigator Elden Graves, went one afternoon to the home where Carloss was staying to talk with him. The home was a single-family dwelling located in a "pretty old

2

area" in the "middle" of Tahlequah.  (R. v.2 at 71-72.)  There was no evidence of any fence or other enclosure around the house or yard, but there were several "No Trespassing" signs placed in the yard and on the front door.  Specifically there was a "No Trespassing" sign on an approximately three-foot-high wooden post located beside the driveway, on the side farthest from the house, and another sign tacked to a tree in the side yard, both stating "Private Property No Trespassing."  (Aplt. Add. Def. Ex. 2-5, 7.) There was a sign, on a wooden pole in the front yard along the side of the driveway closest to the house, and a sign on the front door of the house, both stating "Posted Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden Violators Will Be Prosecuted."  (Id. Ex. 1, 6.)  These signs were professionally printed, with yellow or orange lettering against a black background.  Although the officers testified that they did not recall seeing any of these signs on the day they went to talk to Carloss, the district court found that the signs were there on that day, and that is not contested on appeal.

When the two officers went to the house to speak with Carloss, they drove into the driveway, parked, walked to the front door, and knocked "for several minutes."  (R. v.2 at 74.)  In response to their knocks, the officers could hear movement inside the house, but no one answered the front door.  Instead, "a short time later," Heather Wilson exited the back door of the house and met the officers in the side yard.  (Id. at 17.)  The officers explained why they were there and asked who else was in the home.  Wilson responded that Carloss, Earnest Dry, and Katy Homberger were inside.

At about that time, Carloss exited the back door of the house and joined the

officers and Wilson in the side yard.  At no time did either Wilson or Carloss point out the "No Trespassing" signs to the officers or ask the officers to leave.  The officers told Carloss that they suspected he had a machine gun.  Carloss responded that he could not be around "ammunition" because of his prior criminal conviction.  (Id. at 18.)  The officers then asked who lived in the house; Carloss responded that he had a room there, but Earnest Dry owned the house.  (Earnest Dry's mother, Diana Fishinghawk, was the actual owner.)  When the officers asked Carloss if they could search the home, Carloss told them he would have to get "the man of the house," referring to Dry.  (Id.)  As Carloss started to go inside, apparently to get Dry, the officers asked if they could go in with Carloss; he said, "sure."[1]  (Id. at 19.)

Carloss and the officers entered the back door, went through a storage or "mud" room into a room that Carloss identified as his.  (Id. at 34.)  In Carloss's room, the officers saw drug paraphernalia and a white powder residue that appeared to be methamphetamine.

The officers waited with Carloss in his room; Dry and Homberger soon entered. The officers identified themselves, explained to Dry why they were there and asked if they could search the house.  Dry asked if they had a warrant; they did not.  After calling his attorney, Dry declined to let the officers search the house and instead asked them to leave.  They did so but, based on the drug paraphernalia the officers saw in Carloss's

---

[1] At the suppression hearing, Carloss gave a different version of these events, but the district court found that the officers' testimony was more credible than Carloss's.  On appeal, Carloss does not challenge that credibility determination.

4

room, they obtained a warrant to return and search the house. During the search pursuant to that warrant, officers found "multiple methamphetamine labs" and lab components, a loaded shotgun, two blasting caps, ammunition, and other drug paraphernalia. (R. v.3 (sealed) Doc. 80 ¶¶ 15-19.)

Based on this evidence, the United States prosecuted both Carloss and Dry for drug and weapons offenses. After unsuccessfully moving to suppress the evidence found in the house, Carloss pled guilty to conspiring to possess pseudoephedrine; the district court sentenced him to forty-nine months in prison and three years' supervised release. His conditional guilty plea permitted this appeal to challenge the denial of his suppression motion.

## STANDARD OF REVIEW

In reviewing the district court's decision to deny Carloss's suppression motion, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of [the] reasonableness [of the officers' actions] under the Fourth Amendment." United States v. Pettit, 785 F.3d 1374, 1378-79 (10th Cir. 2015), cert. denied, 2015 WL 5050544 (U.S. Oct. 5, 2015).

## DISCUSSION

### I. The officers did not violate the Fourth Amendment by going to the front door and knocking, seeking to speak with Carloss

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated."  U.S. Const., amend. IV.  "[H]ouses," for Fourth Amendment purposes, include a home's curtilage, and a home's "front porch is the classic exemplar" of curtilage.  Florida v. Jardines, 133 S. Ct. 1409, 1415 (2013).  Carloss contends that the search of his home pursuant to the warrant was illegal because the officers got the warrant based on information that they obtained in violation of the Fourth Amendment when they trespassed onto the curtilage of his home—the front porch—to knock on the front door, seeking to speak with him.[2]

**A.  The Tenth Circuit has upheld an officer's knocking on the front door seeking to speak with a home's occupants**

This court has held, prior to Jardines, that police officers do not violate the Fourth Amendment by going to the front door of a home and knocking, seeking to speak with the occupants.  Specifically addressing an investigative knock-and-talk—during which police officers knock on the door of a home seeking to speak with the occupants, see United States v. Carter, 360 F.3d 1235, 1238 (10th Cir. 2004)—this court has held that, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006); see also, e.g., United States v. Harrison, 639 F.3d 1273, 1276 n.1 (10th Cir. 2011); United States v. Parker, 594

---

[2] The Fourth Amendment protects against the government's 1) unprivileged trespass on property expressly protected by the Fourth Amendment—"persons, houses, papers, and effects"—for the purpose of conducting a search or seizure; and 2) infringement of an individual's reasonable expectation of privacy.  See Jardines, 133 S. Ct. at 1414, 1417; see also United States v. Jones, 132 S. Ct. 945, 949-53 (2012).  Carloss expressly bases his argument solely on the trespass theory of Fourth Amendment protections and we, therefore, confine our analysis to that theory.

6

F.3d 1243, 1244 n.1 (10th Cir. 2010); cf. Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."). See generally Kentucky v. King, 563 U.S. 452, 131 S. Ct. 1849, 1862 (2011) ("[W]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do.").

The home's occupant remains free to terminate the conversation or even to avoid it altogether by not opening the door. See King, 133 S. Ct. at 1862 ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.").

## B. Jardines did not change our prior law upholding knock-and-talks

The Supreme Court recently reaffirmed the validity of police knock-and-talk encounters in Jardines, 133 S. Ct. 1409. Jardines expressly recognizes that a police officer, like any member of the public, has an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants. See id. at 1416.

### 1. Jardines did not involve a knock-and-talk

In Jardines, officers approached the front door of a home, not seeking a consensual knock-and-talk, but instead specifically to conduct a search from the porch. The officers took a drug-sniffing dog onto Jardines's front porch in order to gather information about what was occurring inside the home. Id. at 1413, 1416-18; cf. Kyllo v. United States, 533

7

U.S. 27, 29, 35 n.2, 40 (2001) (holding that an officer's use of a thermal-imaging device from a public street to detect relative amounts of heat inside the home was a search). The Jardines Court held that the license to approach a home and knock on the front door does not extend to permitting an officer to perform a search of the interior of the house from the porch with the enhanced sensory ability of a trained dog. 133 S. Ct. at 1416 (stating that, for a home's occupant "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police"); see also id. at 1416-17 & 1416 n.4. In reaching that conclusion, however, Jardines reiterated that a knock-and-talk itself is not a search for Fourth Amendment purposes: "[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that. The mere purpose of discovering information in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment." Id. at 1416 n.4 (citation, internal quotation marks omitted)). The Jardines dissenters agreed with this part of the analysis. Id. at 1423 (Alito, J., dissenting) ("[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence.") (internal quotation marks omitted). Thus, Jardines left our preexisting knock-and-talk precedent undisturbed.

> **2. In this case, the officers did not conduct a search when they went onto the front porch to knock on Carloss's front door**

8

This case is distinguishable from <u>Jardines</u> because there is nothing in this record to suggest that the officers conducted, or intended to conduct, a search from the front porch when they went onto the front porch to knock on Carloss's front door. <u>See</u> <u>Jardines</u>, 133 S. Ct. at 1414-16; <u>see also</u> <u>United States v. Walker</u>, 799 F.3d 1361, 1363-64 (11th Cir. 2015). The officers did not attempt to gather data about what was occurring inside the house from the front porch, nor did they take with them anything that would enhance their ability to do that, like the drug-sniffing dog in <u>Jardines</u> or the thermal imaging device at issue in <u>Kyllo</u>. Here, the officers simply went to the front door and knocked, seeking to speak consensually with Carloss. Nor did the officers discover any incriminating evidence while they were on the front porch knocking.[3]

**C. Post-<u>Jardines</u> cases make clear that <u>Jardines</u> did not restrict knock-and-talks**

Since <u>Jardines</u>, the Tenth Circuit has continued to uphold the constitutionality of knock-and-talks, based on the implied license recognized in <u>Jardines</u> that allows police officers, like members of the public, to approach the front door of a home and knock. <u>See</u> <u>United States v. Shuck</u>, 713 F.3d 563, 567 (10th Cir. 2013) ("A 'knock-and-talk' is a

---

[3] Had the officers discovered incriminating evidence while lawfully on the front porch knocking, however, that would not violate the Fourth Amendment. <u>See</u> <u>United States v. McDowell</u>, 713 F.3d 571, 574 (10th Cir. 2013). In <u>McDowell</u>, a post-<u>Jardines</u> case, an officer, at 11:00 p.m., walked on the driveway and front walk of a home, on his way to the front door to conduct a knock-and-talk. <u>Id.</u> at 572. On his way to the front door, the officer smelled a strong odor of marijuana coming from the garage. <u>Id.</u> This court held that, "whether or not the driveway and front sidewalk were curtilage, [the officer] did not violate the Fourth Amendment by traversing them on his way to the front door. Thus, the smell of marijuana that reached him while he was in the driveway was not fruit of an unlawful search."

9

consensual encounter" that "does not contravene the Fourth Amendment.") (internal quotation marks omitted); see also McDowell, 713 F.3d at 574.[4]

### D. There was an implied license here for members of the public to go onto the curtilage of Carloss's home in order to knock on the front door

#### 1. Jardines recognizes such an implied license

Jardines recognizes an implied license that "typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer), leave." 133 S. Ct. at 1416. On this basis, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. (quoting King, 131 S. Ct. at 1862).

Carloss contends that neither he nor Dry gave officers a license to approach the house and knock. But, because such "[a] license may be implied from the habits of the country," id. at 1415 (internal quotation marks omitted), a resident need not affirmatively grant the license. See generally James W. Ely, Jr. and Jon W. Bruce, The Law of Easements and Licenses in Land, § 11.2 (updated Sept. 2015) ("Licenses may . . . be implied from the conduct of a landowner or from local custom." (footnote omitted)).

#### 2. The implied license at Carloss's home had not been revoked

Carloss contends that the "No Trespassing" signs placed on and about the house where he lived revoked the implied license that the public has to approach the house and

---

[4] The Fourth and Eleventh Circuits have also upheld knock-and-talks after Jardines. See Walker, 799 F.3d at 1363 (11th Cir.); Covey v. Assessor of Ohio Cnty., 777 F.3d 186, 192-93 (4th Cir. 2015). There does not appear to be any circuit that has concluded, after Jardines, that a knock-and-talk is invalid.

knock on the front door. Whether that is so depends on the context in which a member of the public, or an officer seeking to conduct a knock-and-talk, encountered the signs and the message that those signs would have conveyed to an objective officer, or member of the public, under the circumstances.[5] See State v. Christensen, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *8 (Tenn. Crim. App. May 14, 2015) (unpublished) (holding that "the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property"), appeal granted, (Tenn. Sept. 22, 2015); cf. State v. Hiebert, 329 P.3d 1085, 1090 (Idaho Ct. App. 2014) (holding, in case involving police entering a combined business (junk yard) and residence, that, although the defendant's father, who resided there, "testified that the back of the junk yard is closed to the public and that people are supposed to stop at the shop, the [relevant] question is what an ordinary visitor to the business property, not knowing the subjective intent of the owner, would have objectively perceived as reasonable conduct"). We conclude that, under the circumstances presented here, the "No Trespassing" signs placed about

---

[5] In this case, the property owner, Diana Fishinghawk, testified that her daughter put up the "No Trespassing" signs at the home in which Carloss lived seven years earlier, when the daughter lived in the house, because she was having trouble with "drunks" from a nearby bar wandering onto the property (R. v.2 at 103); Fishinghawk advised her daughter that the "No Trespassing" signs would assist the police in removing the drunks from the property. According to Fishinghawk, the "No Trespassing" signs were not intended to keep police officers from investigating crimes or providing assistance. Nevertheless, the relevant inquiry here, in determining whether the signs revoked the officers' implied license to approach the house and knock, has to be measured, not by what the resident subjectively intended, but instead by what an objective officer would have perceived.

11

Carloss's home would not have conveyed to an objective officer that he could not go to the front door and knock, seeking to speak consensually with Carloss.

As an initial matter, just the presence of a "No Trespassing" sign is not alone sufficient to convey to an objective officer, or member of the public, that he cannot go to the front door and knock. Such signs, by themselves, do not have the talismanic quality Carloss attributes to them. See Davis v. City of Milwaukee, No. 13-CV-982-JPS, 2015 WL 5010459, at *13 (E.D. Wis. Aug. 21, 2015) (indicating, post-Jardines, that "signs stating 'Private Property' or 'No Trespassing' do not, by themselves, create an impenetrable privacy zone"); United States v. Jones, No. 4:13CR00011-003, 2013 WL 4678229, at *5 (W.D. Va. Aug. 30, 2013) (stating, post-Jardines, that "No Trespassing" "signs do not, in and of themselves, create a right to privacy or automatically place an area under the Fourth Amendment's protections"); see also City of Beatrice v. Meints, 856 N.W.2d 410, 421 (Neb. 2014) (holding, post-Jardines, that a resident "could not reasonably expect that tacking a 'no trespassing' sign to a tree would prevent others from viewing or walking on his land"), cert. denied, 135 S. Ct. 2388 (2015); Christensen, 2015 WL 2330185, at *6-*8 (Tenn. Crim. App.) (rejecting, post-Jardines, a bright-line rule that a "No Trespassing" sign revokes the implied license to approach a front door to conduct knock-and-talk). Carloss has not cited, nor can we find, any post-Jardines authority holding that a resident can revoke the implied license to approach his home and knock on the front door simply by posting a "No Trespassing" sign.

Here, with the exception of the sign on the front door, the "No Trespassing" signs were placed in the unenclosed front and side yards and along the driveway of the house

12

where Carloss lived. Because Carloss does not expressly claim that these areas were part of the home's curtilage—and it was Carloss's burden to establish what was included in the home's curtilage, see United States v. Cavely, 318 F.3d 987, 994 (10th Cir. 2003)—these areas were instead "open fields." See Reeves v. Churchich, 484 F.3d 1244, 1255 (10th Cir. 2007) (holding, where there was no evidence that a front yard was enclosed, used for intimate activities of the home, or in any way protected from observation, that front yard was not part of the home's curtilage but was instead an open field); see also United States v. Cousins, 455 F.3d 1116, 1122-24 (10th Cir. 2006) (holding side yard was not curtilage).

Those signs would not have conveyed to an objective officer, or member of the public, that he could not walk up to the porch and knock on the front door and attempt to contact the occupants. It is well-established that "No Trespassing" signs will not prevent an officer from entering privately owned "open fields." See Jardines, 133 S. Ct. at 1414; Oliver v. United States, 466 U.S. 170, 182-83 (1984); see also Rieck v. Jensen, 651 F.3d 1188, 1189, 1191-94 (10th Cir. 2011) (holding that a deputy sheriff's entry onto private property that was not curtilage, by opening a closed gate with a "No Trespassing" sign and despite homeowner telling deputy he had no right to enter, did not violate the Fourth Amendment). That is true even though the officers' entry into the yard might be considered a trespass at common law, see Oliver, 466 U.S. at 183-84 ("[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment."); Rieck, 651 F.3d at 1191 (10th Cir.) (stating that "the Supreme Court has made it clear that the Fourth

13

Amendment does not track property law," citing Oliver and United States v. Dunn, 480

U.S. 294 (1987)); or might have violated Oklahoma statutory law, see United States v.

Hatfield, 333 F.3d 1189, 1198-99 (10th Cir. 2003) (holding officers did not violate the

Fourth Amendment when they made observations from a defendant's open field, even

though the officers, in entering the open field, violated Okla. Stat. tit. 21, § 1835).[6]

There was also a sign on the front door itself stating: "Posted Private Property

Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden

Violators Will Be Prosecuted."  (Aplt. Add. Def. Ex. 1.)  But that sign was ambiguous

and did not clearly revoke the implied license extended to members of the public,

including police officers, to enter the home's curtilage and knock on the front door,

---

[6] See generally Virginia v. Moore, 553 U.S. 164, 166, 176, 178 (2008) (holding that an arrest was reasonable under the Fourth Amendment even though it violated state law, and stating that "linking Fourth Amendment protections to state law would cause them to vary from place to place and from time to time" (internal quotation marks omitted)); California v. Greenwood, 486 U.S. 35, 43 (1988) ("We have never intimated . . . that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.  We have emphasized instead that the Fourth Amendment analysis must turn on factors such as our societal understanding that certain areas deserve the most scrupulous protection from government invasion." (internal quotation marks omitted)); United States v. Jones, 701 F.3d 1300, 1309-10 (10th Cir. 2012) (stating that, under facts presented there, the question of whether Missouri officers were acting without authority under Kansas state law was "irrelevant" to the question of whether they violated the Fourth Amendment, that "officers' violation of state law is not, without more, necessarily a federal constitutional violation," and that, "[w]hile compliance with state law may be relevant to our Fourth Amendment reasonableness analysis in some circumstances, we have never held it to be determinative of the constitutionality of police conduct" (internal quotation marks omitted)); United States v. Madden, 682 F.3d 920, 927 (10th Cir. 2012) ("Whether an arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." (internal quotation marks omitted)).

14

seeking to speak consensually with the occupants. The sign on the front door of Carloss's home referenced activities that ordinarily do not take place within a home or its curtilage—hunting, fishing, and trapping. Thus, on its face, this sign does not appear to be directed to people who desire to approach and speak directly with the occupants of the home in the ordinary course of societally accepted discourse. When considered in light of the other, similar "No Trespassing" signs in Carloss's yard, this front door sign could have simply been reiterating that such recreational activities would not be allowed on the property generally. See Christensen, 2015 WL 2330185, at *8 (Tenn. Crim. App.) (stating that a "sign reading 'no trespassing[,] hunting[,] or fishing,' posted in a field next to appellant's driveway . . . would not have prevented the casual visitor or the reasonably respectful citizen from approaching appellant's residence"; citing cases indicating that "such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence"). The message here does not clearly and unambiguously tell the mail carrier, pizza deliverer, or police officer that they cannot knock on the front door seeking a consensual conversation with those who live there. See Jones, 2013 WL 4678229, at *1-*2, *5-*6 (W.D. Va.) (holding, post-Jardines, that officers did not violate the Fourth Amendment by entering rural property, driving past "No Trespassing" signs on either side of the driveway, passing another sign on their way to the house and another affixed to the house, and walking past a "No Trespassing" sign hanging to the right of the front door in order to conduct a knock-and-talk). We conclude that, under the circumstances presented here, an objective officer would not have understood that the implied license he

15

would ordinarily have to approach the porch and knock on the front door of a home had been revoked at this house. Therefore, the officers did not violate the Fourth Amendment when they went onto the porch and knocked on the front door of the house in which Carloss lived. See United States v. Bearden, 780 F.3d 887, 890-91, 893-94 (8th Cir. 2015) (holding that officers did not violate the Fourth Amendment by driving through an open gate with a "No Trespassing" sign on their way to entering a home's curtilage in order to conduct a knock-and-talk); United States v. Lubrin, No. CR-2014-0056, 2015 WL 361796, at *2, *5-*6 & *5 n.6, *6 n.7 (D. V.I. Jan. 28, 2015) (holding that officers did not violate the Fourth Amendment by entering a home's curtilage through a gate in a fence, to conduct knock-and-talk, despite a "No Trespassing" sign on the fence, but not near gate); Hiebert, 329 P.3d at 1089 n.2, 1090 (Idaho Ct. App.) (holding that "No Trespassing" signs located in curtilage "cannot reasonably be interpreted to exclude normal, legitimate inquiries or visits by ordinary individuals, including police officers, who restrict their movements to the areas normally used by a reasonable visitor"); Pache v. State, 413 S.W.3d 509, 511-12 (Tex. App. 2013) (holding the officers could enter curtilage and go to front door and knock, notwithstanding testimony that there was a "No Trespassing" sign at the gate through which the officers entered front yard); see also Covey v. Assessor of Ohio County, 777 F.3d 186, 190, 192-94 (4th Cir. 2015) (suggesting that police officers conducting knock-and-talk at a "privately set home in [a] rural village" did not violate the Fourth Amendment by driving past two "No Trespassing" signs posted along driveway); Holloran v. Duncan, 92 F. Supp. 3d 774, 783-84, 787-88 (W.D. Tenn. 2015) (holding that officers did not violate the Fourth

16

Amendment by entering onto "farm property" by removing locked gate and driving past "No Trespassing" signs); United States v. Denim, No. 2:13-CR-63, 2013 WL 4591469, at *1-*6 (E.D. Tenn. Aug. 28, 2013) (holding, without discussing what areas of the home were curtilage, that placing six "No Trespassing" signs along a driveway leading to a home did not revoke the implied license to approach home and knock, seeking to talk with occupants).

## E. The officers did not exceed the scope of the implied license by knocking too long

Carloss further argues that the officers exceeded the scope of their implied license because they knocked at his front door too long. We cannot agree. The implied license Jardines recognized "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 133 S. Ct. at 1415. We decline to place a specific time limit on how long a person can knock before exceeding the scope of this implied license. Here, the officers testified that they knocked "for several" minutes or "a minute or two." (R. v. 2 at 26, 74.) The officers were no doubt encouraged to remain a bit longer, hoping someone would respond to their knock, because they heard movement inside the house and received no request from inside the house to depart. In fact, Heather Wilson emerged from the back door of the house only "a short while later," or "a minute or so later," and met the officers in the side yard. (Id. at 17, 63.) There is no suggestion that the officers knocked aggressively or demanded entry. Under these circumstances, we cannot say that the officers exceeded the implied license they had to approach the house and knock, seeking

17

to speak with the occupants.

## II. The district court did not clearly err in finding that Carloss voluntarily consented to the officers accompanying him into the home

Finally, the district court did not clearly err in finding that Carloss voluntarily consented to the officers following him into the house. See United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008) (holding "[v]oluntariness is a factual finding" reviewed for clear error); see also Jones, 701 F.3d at 1318 (10th Cir.) (setting forth factors to consider in deciding whether consent was voluntary); United States v. Benard, 680 F.3d 1206, 1211 (10th Cir. 2012) (same).

Carloss first argues that his consent was the product of a Fourth Amendment violation—the officers' unlicensed knocking on the front door. But we have concluded there was no such Fourth Amendment violation.

Carloss further asserts that his consent that the officers enter the house was involuntary because there was testimony suggesting that the officers conveyed to him, before he consented, that they would not let him enter the home without them; and that, because Carloss told the officers he could not consent to the search of the house, the officers should not have believed that Carloss could consent to their accompanying them into the home. However, the district court found that Carloss voluntarily consented to the officers accompanying him into the house, and that finding was not clearly erroneous.

There were only two officers, dressed in plainclothes. They never drew their weapons. There was no evidence that the officers physically touched or mistreated Carloss, nor that they got Carloss to let them enter the house using threats or promises.

18

The officers spoke in a casual, rather than an aggressive, manner, never demanding entry into the house or otherwise claiming any lawful authority to be admitted. They did not retain any of Carloss's personal effects and there is no suggestion that Carloss had any physical or mental deficits that the officers exploited. Carloss's conversation with the officers occurred in the side yard, in public view during daylight hours. See Benard, 680 F.3d at 1211 (considering, in determining whether consent was voluntary, fact that interaction between officer and individual occurred in public place during daylight). Furthermore, although the officers did not inform Carloss that he could refuse their request to accompany him into the house (which is not a prerequisite for voluntary consent, see Schneckloth v. Bustamonte, 412 U.S. 218, 231-33 (1973)), Carloss was aware he could refuse the officers' request because he had just declined to give them broader general consent to search the house, indicating instead that the officers would have to ask Dry for permission to do that. For these reasons, the district court's finding that Carloss voluntarily consented to the officers accompanying him into the house was not clearly erroneous.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to deny Carloss's suppression motion.

19

13-7082, *United States v. Carloss*

**TYMKOVICH**, Chief Judge, concurring.

I concur with the lead opinion, but write separately to explain more precisely my thinking on the novel question presented by this case.

Because the license to walk up to the front door is "implied from the habits of the country," *Florida v. Jardines*, 133 S. Ct. 1409, 1415 (2013), we presume that every homeowner has granted that license absent any contrary indication. *See id.* ("[T]he knocker on the front door is treated as an invitation or license to attempt an entry."). Thus, the homeowner has the burden of showing that he has opted out of "the habits of the country." *See* Dan B. Dobbs, The Law of Torts 220 (2000) (noting that failure to "show your dissent from the general custom of the community" can "reasonably be taken to import consent" to its continued application to you). Because revocation deviates from the background norm, the property owner must make his revocation plain.

To me, the court must deploy an objective test, asking whether a reasonable person would conclude that entry onto the curtilage—the front porch here—by police or others was *categorically* barred. In other words, we look to each case's facts to determine whether the reasonable person would think the license had been revoked. And the question presented by this case is whether "No Trespassing" signs in the circumstances here communicates a categorical bar that is clear that no one would step on the front porch. In my view, this is a question of context: the time, place, manner, and circumstance of the encounter.

I agree with Judge Ebel that Carloss failed to show that the implicit license to access the front porch was revoked. The Restatement of Torts helps frame the scope of this inquiry. A license created by a landowner to enter land can be terminated by a "revocation of [his] consent," of which a would-be visitor "knows or has reason to know." Restatement (Second) of Torts § 171(b) (1965). Specifically, a would-be visitor must know or have reason to know that the homeowner "has done an act" that is "necessarily inconsistent with a continuance of the consent." *Id.* cmt. b. A visitor has "reason to know" when he "has information from which a person of reasonable intelligence . . . would infer that [the homeowner revoked the license]." *Id.* § 12.

The signs in this case of course communicated variants of the phrase "No Trespassing." But in light of the strong social presumption that a visitor to a residential neighborhood can enter the front porch curtilage to knock, I doubt a reasonable, lawful visitor would believe that "No Trespassing" eliminated that presumption in every instance. Every reasonable person knows—even without seeing a "No Trespassing" sign—that one cannot trespass on private property. But that knowledge coexists with knowledge of the equally well-established principle that one may generally enter the curtilage to knock. A reasonable observer could also understand a "No Trespassing" sign as restating the "no-trespassing" principle without thinking it had any bearing on the implicit license

2

to enter the curtilage for social reasons.[1]  In a residential context, the intention of the homeowner who posts signs, without more, seems inadequate to revoke the license.  *See, e.g.*, *State v. Hiebert*, 329 P.3d 1085, 1090 (Idaho Ct. App. 2014) (noting that "where a 'no trespassing' sign is ambiguous and not clearly posted, the implied invitation to enter the curtilage of a home via the normal access routes is not revoked").  I emphasize that it is not my view that a "No Trespassing" sign will *never* indicate the revocation of the implied license. Rather, the circumstances of this case do not indicate a revocation occurred such that the police could not reasonably believe entry was permissible.

The Supreme Court acknowledges this point in several cases explaining the curtilage rule. In *Oliver v. United States*, 466 U.S. 170 (1984), for example, the Court found that a landowner's property rights did not exclude police despite the fact the owner "erected fences and 'No Trespassing' signs around the property." *Id.* at 182.  "Nor is the government's intrusion upon an open field a 'search' in the constitutional sense because that intrusion is a trespass at common law. The existence of a property right is but one element in determining whether expectations of privacy are legitimate." *Id.* at 183.  *See also United States v.*

---

[1] For example, trespass in Oklahoma is the "willful[] or malicious[]" entry of the property "of another after being expressly forbidden to do so or without permission of the owner . . . when such property is posted."  Okla. Stat. tit. 21, § 1835.a.  A reasonable observer might well take a "No Trespassing" sign simply to reiterate that he could not enter the property *if* he was forbidden to do so, not that it actually forbade him to enter.

3

*Dunn*, 480 U.S. 294, 300 (1987) (police crossed barbed wire and wooden fences accessing barn outside curtilage).

Of course, the right facts could remove that ambiguity. For example, a "No Trespassing" sign posted on a fence encircling a property imparts a different message than the same sign standing alone. And a closed or locked gate, especially in the residential context, imparts more information to the reasonable observer. *See, e.g.*, *State v. Christensen*, 953 P.2d 583, 587–88 (Idaho 1998) (holding that "No Trespassing" sign "clearly posted on a gate across the only public access to the property" revoked the implicit license because "the message to the public was [not] ambiguous"). But nothing aside from their numerosity makes the "No Trespassing" signs in this case particularly distinctive. And numerosity alone does not eliminate the ambiguity I noted above. No special facts—like a fence or other physical obstacle—clarified to the reasonable visitor that these signs revoked the license.

Thus, context matters. Is the home on a suburban residential street, like here, or an urban row with a small step to the front door? Or is the property fenced acreage in the Rocky Mountains on prime fishing water far from civilization? Would a "No Trespassing" sign really communicate that first responders, or Girl Scouts, or even officious neighbors were categorically barred from the front porch? Was the sign coupled with more information that peddlers

4

or the police were particularly unwelcome that might alter the message understood by a reasonable observer?  And so on.

The dissent points to *Breard v. City of Alexandria*, 341 U.S. 622 (1951), as supporting its view that the placement of the sign in this case revoked the implied license.  But I do not think the *Breard* case meaningfully informs our analysis. That case dealt with the constitutionality (under the First Amendment and the Commerce Clause) of a state statute regulating the rights of solicitors and peddlers to go into private residences.  *Id.* at 624.  The dissent correctly notes that the case endorsed, as one method of providing notice of revocation of the implied license to knock, state statutes that allowed for criminal trespass actions if a solicitor entered land posted with "No Trespassing" signs.  *Id.* at 626 n.2.  But we know that state law is not determinative of objective "reasonableness."  For example, in *Virginia v. Moore*, the Supreme Court found an arrest reasonable despite state law not allowing such an arrest.  553 U.S. 164, 179 (2008).  The Court made clear that the Fourth Amendment does not simply "incorporate" state statutes.  *Id.* ("No early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes.").  Indeed, the Fourth Amendment's history suggests "if anything, that founding-era citizens were skeptical of using the rules for search and seizure set by government actors as the index of reasonableness."  *Id.*  The dissent concedes that the common law is not determinative in deciding whether "No Trespassing" signs revoke the

5

customary license. *See* Dissent at 14 n.7. So in asking whether the officers'

actions in this case were reasonable, we should look to the particular

circumstances before us, and not state statutes that may allow for trespass actions.

Under this analysis, I do not think the officers unreasonably believed they could

enter the curtilage to knock despite the presence of the signs.

I recognize the attractiveness of the dissent's view that the inquiry begins

and ends with the posting of a "No Trespassing" sign. *See, e.g.*, *Powell v. State*,

120 So. 3d 577, 584 (Fla. Dist. Ct. App. 2013) (indicating "No Trespassing" signs

alone "effectively negate" the implicit license). But the general rule is that we

consider the revocation of an implicit license under the reasonable person

standard. And situations undoubtedly exist where the reasonable person would

not think a "No Trespassing" sign revoked the license. I think the inquiry,

therefore, cannot be as simple as the dissent suggests. The result turns on the

totality of the circumstances.

In my view, because the implicit license was not revoked, police could

approach Carloss's door and knock, as "any private citizen might do." *Jardines*,

133 S. Ct. at 1416. Subjective intent to investigate makes no difference. We

often characterize knock and talks pursuant to the implicit license as

"investigations." *See, e.g.*, *United States v. McDowell*, 713 F.3d 571, 574 (10th

Cir. 2013); *see also Jardines*, 133 S. Ct. at 1424 (Alito, J., dissenting) (noting

that the "purpose of discovering information" is the objective of a knock and

6

talk). A desire to gain information does not make illegitimate a private citizen's use of the implicit license to enter the curtilage—indeed, that is the purpose of many such approaches. The same implicit license justifies police knock and talks. *See Jardines*, 133 S. Ct. at 1416 n.4.

And, barring its revocation, it justified the knock and talk here. We do not have the situation in *Jardines* where police used sensory extending drug dogs or hypothetically could have used their access to study the interior of the targeted house. A mere investigatory purpose will not invalidate an otherwise licensed police entry into the curtilage in every instance. A Fourth Amendment physical-intrusion case poses a twofold question: (1) whether police intruded without license into a constitutionally-protected area, and (2) whether they obtained information via that intrusion. *See id.* at 1414–15. Subjective intent is irrelevant. *See id.* at 1416 n.4 (noting that a police "purpose of discovering information" is permissible as long as the intrusion is licensed).[2]

To be sure, the *Jardines* Court said the question "whether the officer's conduct was an objectively reasonable search" turned on "whether the officers

---

[2] This case's focus on Fourth Amendment physical-intrusion doctrine does not suggest that the reasonable-expectation test rooted in *Katz v. United States*, 389 U.S. 347 (1967), is not still good law. *See Jardines*, 133 S. Ct. at 1417 ("The *Katz* reasonable-expectations test has been *added to*, not *substituted for*, the traditional property-based understanding of the Fourth Amendment . . . .") (internal quotation marks omitted). The two exist simultaneously; *Katz* is simply not implicated here.

7

had an implied license to enter the porch, which in turn depends upon the purpose for which they entered." *Id.* at 1417. But this accords with the objective framework outlined above. The Court's point was simple: a reasonable person would think the implicit license, which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," *id.* at 1415, does not authorize the public to scour the curtilage for drugs with a drug-sniffing dog, *see id.* at 1416 ("[I]ntroducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*."). Thus, *Jardines* did turn on why those officers entered the porch, because intending to search with a drug-sniffing dog is irreconcilable with intending to use the implicit license as the general public would. *See id.* Those officers intended the former. Consequently, although the implicit license remained intact, it did not shield them. Their conduct was simply beyond its scope.

That is not the case here. These officers entered the curtilage to gain information just as any private citizen would—by speaking with the owner, not by searching with a drug dog. Their "purpose of discovering information" did not cause that entry to violate the Fourth Amendment, as long as the entry was "permitted conduct"—that is, as long as the implicit license had not been revoked. *See id.* at 1416 n.4. Our case thus hinges entirely on the revocation question.

8

And that question, as I have explained, turns on an objective application of the reasonable person standard.

Consequently, as long as an officer really is using the implicit license, his intent is irrelevant. The *Jardines* Court's repeated statement of the governing rule without any reference to officer intent makes this clear. *See id.* at 1414 (noting that a "search within the original meaning of the Fourth Amendment" has occurred when "the Government obtains information by physically intruding on" constitutionally protected areas) (internal quotation marks omitted); *id.* at 1415 (noting that, because the investigation "took place in a constitutionally protected area" the relevant question was "whether it was accomplished through an unlicensed physical intrusion"); *id.* (noting that, where the investigation takes place in a protected area, the "only question is whether [the occupant has] given his leave (even implicitly) for [the police to enter]").

One final point: police ability to enter the curtilage is not untrammeled; if a homeowner revokes the license with sufficient clarity, police can no longer avail themselves of the implicit license. Of course, police can always enter a home if an emergency or other exigent circumstance has provided sufficient justification to enter. But where no such circumstances exist, police entry into the curtilage turns on the implicit license.

9

No. 13-7082, *United States v. Carloss*

**GORSUCH**, Circuit Judge, dissenting.

The "knock and talk" has won a prominent place in today's legal lexicon. The term is used to describe situations in which police officers approach a home, knock at the front door, and seek to engage the homeowner in conversation and win permission to search inside. Because everything happens with the homeowner's consent, the theory goes, a warrant isn't needed. After all, the Fourth Amendment prohibits "unreasonable" searches, and consensual searches are rarely that. No doubt for just this reason law enforcement has found the knock and talk an increasingly attractive investigative tool and published cases approving knock and talks have grown legion. But in the constant competition between constable and quarry, officers sometimes use knock and talks in ways that test the boundaries of the consent on which they depend. So, for example, courts have found that a homeowner's consent isn't freely given when officers appear with a display of force designed to overbear. *See, e.g.*, *United States v. Quintero*, 648 F.3d 660, 670 (8th Cir. 2011). Courts have found consent lacking and a constitutional violation, too, when officers mislead homeowners into thinking they have no choice but to cooperate. *See, e.g.*, *United States v. Harrison*, 639 F.3d 1273, 1280 (10th Cir. 2011).

Today's case comes at us along similar lines but from a different vector. A home's curtilage — that area "immediately surrounding and associated with the home," *Oliver v. United States*, 466 U.S. 170, 180 (1984) — is protected by the

Fourth Amendment much like the home itself. So not only do officers need a warrant, exigent circumstances, or consent to enter a home, they also generally need one of those things to reach the home's front door in the first place. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Typically, of course, officers contend that their intrusion into the curtilage for a knock and talk is justified by the homeowner's implied consent. And usually there's no question about it, for the Supreme Court has recognized that the "knocker on the front door" normally supplies an implied "invitation or license" for visitors of all kinds to enter the home's curtilage and knock at the front door. *Id*. at 1415 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). By placing a knocker on the front door (or, I'm sure, a doorbell next to it), the homeowner is traditionally said to invite even "solicitors" and "hawkers" to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* For this same reason and to the same extent, the Court has explained, law enforcement agents, no less than anyone else, may approach the front door and seek entry. *Id.* at 1415-16.

But what happens when the homeowner manifests an obvious intention to revoke the implied license to enter the curtilage and knock at the front door? When the owner literally substitutes the knocker with a No Trespassing sign, one smack in the middle of the front door? When she adds two more No Trespassing signs at the driveway's mouth to the street, one on either side of the only clear

-2-

access route from the street to the front door — and along the very route any visitor would use to approach the home? And when, for good measure, she posts still another No Trespassing sign between the driveway and the house? So that to enter the home's front porch, its constitutionally protected curtilage, visitors would have to disregard four separate and plainly visible warnings that their presence is wholly unwelcome? May officers still — under these circumstances — enter the curtilage to conduct an investigation without a warrant and absent an emergency?

That's the question we're asked to address today. The district court upheld the officers' conduct as consistent with the Fourth Amendment on the theory that a home's front porch isn't curtilage, so the officers who entered the porch to knock at the door in this case never stepped foot in a constitutionally protected space. On appeal, the government concedes that the district court's reasoning is mistaken because a home's front porch is, in fact, the "classic exemplar" of curtilage. *Id.* at 1415. Still, the government asks us to affirm the result the district court reached on either of two alternative grounds. My colleagues, in turn, don't accept either of the government's arguments but pursue still different theories for affirmance all their own — ones the district court never passed upon and the government never pressed. Respectfully, I do not find any of these various and varied efforts to save the district court's judgment persuasive.

*

Most ambitiously, the government suggests that its officers enjoy an irrevocable right to enter a home's curtilage to conduct a knock and talk. *See, e.g.*, App. Br. at 17 (arguing that, regardless whether a search took place, the knock and talk is "an investigative technique approved by the Supreme Court"). If there were any doubt about its dependence on this theory, the government made it a special point of emphasis at oral argument. A homeowner may post as many No Trespassing signs as she wishes. She might add a wall or a medieval-style moat, too. Maybe razor wire and battlements and mantraps besides. Even *that* isn't enough to revoke the state's right to enter.

In approaching this bold claim it's important to traverse a little common ground first. The Fourth Amendment, we know, prohibits "unreasonable" searches of particular places and things: "persons, houses, papers, and effects." U.S. Const. amend. IV. So even if an officer commits a common law trespass when searching your wheat fields, he does not commit a Fourth Amendment violation because the Amendment does not protect "open fields." *Oliver*, 466 U.S. at 176. But the Amendment does speak to "houses" and, as we've seen, the Supreme Court has held that term embraces with it the curtilage surrounding and associated with the house itself. *See Jardines*, 133 S. Ct. at 1414. The Court has recognized, too, that a "search" occurs when the government physically enters a constitutionally protected area like a home or its curtilage for investigative

-4-

purposes. *Id.* at 1415. An officer approaching your home to return your lost dog or to solicit for charity may not be conducting a "search" within the meaning of the Fourth Amendment. But one calling to investigate a crime surely is. Neither is it necessary for officers to bring with them drug sniffing dogs or thermal imaging technology: they "search" a home's curtilage simply by entering that constitutionally protected place to obtain information. Of course, "law enforcement officers need not 'shield their eyes' when passing by the home 'on public thoroughfares'" — and they may act on what they see in plain view from the places where they are already lawfully present — but "an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id.* (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)); *see also United States v. Jones*, 132 S. Ct. 945, 951 n.5 (2012). The founders understood, too, that a "search" of a constitutionally protected space generally qualifies as "unreasonable" when undertaken without a warrant, consent, or an emergency. *See Steagald v. United States*, 451 U.S. 204, 211 (1981); *Georgia v. Randolph*, 547 U.S. 103, 143 (2006) (Scalia, J., dissenting); William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791, at 753 (2009).

With this background behind us, it quickly comes clear that most of the conditions necessary to establish a violation of the Fourth Amendment are present here. The government concedes that its officers physically entered the home's

curtilage when (and surely at the very latest) they stepped foot on the front porch in order to reach and knock at the front door.[1]  Neither does the government dispute that the officers entered the curtilage to obtain information.  *See* App. Br. at 17 (acknowledging officers approached the home "with a purpose of discovering information"); *see also Jardines*, 133 S. Ct. at 1424 (Alito, J., dissenting) (noting that the "purpose of discovering information" is "certainly the objective of a 'knock and talk'").  And given this, there can be little doubt that the government's actions constituted a search of a constitutionally protected space.  *See Jones*, 132 S. Ct. at 949 ("The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.").  The government acknowledges, too, that it acted without a warrant, exigent circumstances, or the homeowner's *express* consent.  So it is that everything in this case hinges on the existence of *implied* consent permitting the officers to enter the home's curtilage.

---

[1]  At common law the curtilage was far more expansive than the front porch, sometimes said to reach as far as an English longbow shot — some 200 yards — from the dwelling house.  *See* 1 Matthew Hale, Historia Placitorum Coronae 559 (1st American ed. 1847) (1736); Eric Dean Bender, Note, *The Fourth Amendment in the Age of Aerial Surveillance: Curtains for the Curtilage?*, 60 N.Y.U. L. Rev. 725, 733 & n.44 (1985).  But even spotting (without granting) the government its crabbed view of curtilage in this case, there's no dispute it had to enter the homeowner's curtilage in order to reach and knock at the front door.

Even when it comes to that question some common ground remains. No one before us disputes that a knocker or doorbell usually amounts to an implied invitation to enter the curtilage, knock or ring at the front door, and seek leave to enter the home itself. Nether do the parties dispute that the homeowner enjoys the right to revoke this implied invitation — at least when it comes to private visitors — by making it clear to groups like "the Nation's Girl Scouts and trick-or-treaters," *Jardines*, 133 S. Ct. at 1415, or "solicitors, hawkers and peddlers," *Breard*, 341 U.S. at 626, that their presence on the curtilage is unwelcome.

Still, the government says it's subject to different rules — and it's here where our dispute really begins. While a homeowner may stop others from entering his curtilage, the government contends a homeowner may *never* stop its agents from entering the curtilage to conduct a knock and talk. Really, then, the government's argument here isn't that it enjoys a license or invitation flowing from the homeowner, for it turns out the homeowner has nothing to do with it. In the government's telling, its agents enjoy a special and irrevocable right to invade a home's curtilage for a knock and talk — what might be more accurately called a sort of permanent easement — whatever the homeowner may say or do about it.

This line of reasoning seems to me difficult to reconcile with the Constitution of the founders' design. We know that the Fourth Amendment, at a minimum, protects the people against searches of their persons, houses, papers, and effects to the same degree the common law protected the people against such

-7-

things at the time of the founding, for in prohibiting "unreasonable" searches the Amendment incorporated existing common law restrictions on the state's investigative authority. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 326-27 (2001). We know, too, that at the time of the founding the common law permitted government agents to enter a home or its curtilage only with the owner's permission or to execute legal process. No trace of some sort of permanent easement belonging to the state (and state alone) can be found in the common law of the founders' time.[2] In fact, at common law a homeowner could usually revoke any license to enter his property at his pleasure.[3] And state officials no less than private visitors could be liable for trespass when entering without the homeowner's consent.[4]

---

[2] *See* 3 William Blackstone, Commentaries *209, *212-14 (listing implied rights to enter without suggesting any special implied right belonged to the state); *see also Jardines*, 133 S. Ct. at 1415; *Entick v. Carrington*, (1765) 95 Eng. Rep. 807, 817; 2 Wils. K.B. 275, 291 ("[I]f this [wa]s law it would be found in our books . . . ."); Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 646 n.273 (1999) ("[C]ommon-law sources tended to define lawful authority positively and to catalog the forms of authority that existed; as a general matter, the absence of an affirmative statement of authority was understood to mean there was no authority."); *id.* at 624 & n.203.

[3] *See, e.g.*, 3 H. Tiffany, Real Property § 833 (3d ed.); *id.* §§ 834-35 (noting inapplicable exceptions); Restatement (Second) of Torts § 171 (1965); James W. Ely, Jr. & Jon W. Bruce, The Law of Easements and Licenses in Land § 11:6.

[4] *See generally Turner v. Sheriff of Marion Cty.*, 94 F. Supp. 2d 966, 984 (S.D. Ind. 2000); *Voskerchian v. United States*, No. 98-CV-0335E(M), 1999 WL 66709, at *4 (W.D.N.Y. Feb. 10, 1999); *see also Minnesota v. Carter*, 525 U.S. 83, 101 (1998) (Kennedy, J., concurring); *Walker v. City of Denver*, 720 P.2d 619,

The government disputes none of this apparently dispositive authority. In fact, it doesn't even address it. Instead, the government replies by pointing (again and only) to the Supreme Court's observation that officers *usually* enjoy the homeowner's implied consent to enter the curtilage to knock at the front door. *See* App. Br. at 17 (citing *Jardines* and *King v. Kentucky*, 131 S. Ct. 1849 (2011)). But nothing in that prosaic observation purported to upend the original meaning of the Fourth Amendment or centuries of common law recognizing that homeowners may revoke by word or deed the licenses they themselves extend. In fact, the Court in *Jardines* took pains to emphasize that the implied license that might have permitted the officers to enter the curtilage in that case was the same common law license generally enjoyed by private visitors — one entitling the officers to do "no more than any private citizen might." 133 S. Ct. at 1416 (quoting *King*, 131 S. Ct. at 1862). If anything, then, *Jardines* reaffirmed the fact that the implied license on which the knock and talk depends is just that — a license, not a permanent easement, and one revocable at the homeowner's pleasure.[5]

---

623-24 (Colo. App. 1986); *Loe v. Whitman*, 107 So. 2d 536, 539-41 (La. Ct. App. 1958); *Moore v. Duke*, 80 A. 194, 196 (Vt. 1911); *State ex rel. McPheron v. Beckner*, 31 N.E. 950, 951 (Ind. 1892); *Grumon v. Raymond*, 1 Conn. 40, 45-47 (1814); *Entick*, 95 Eng. Rep. at 817; *Craddock v. Erving* (Mass. Super. Ct. 1761) (cited in Cuddihy, *supra*, at 595 & n.81).

[5] The only other case the government has cited in support of its theory (and cited only in oral argument) offers no reason to doubt any of this. In *United States v. Denim*, No. 2:13-CR-63, 2013 WL 4591469 (E.D. Tenn. Aug. 28, 2013),

The bottom line then is plain.  The government has identified no colorable

authority and has presented no plausible argument for its primary theory in this

appeal.  Not one of the members of this court accepts it.  In fact, neither of my

colleagues' opinions even dignifies it with discussion.

*

If we decline to adopt its main theory on appeal, the government asks us to

entertain another alternative ground for affirmance.  Accepting now for

argument's sake that the implied license to enter the curtilage extends no more to

---

a magistrate did suggest that the government should enjoy an irrevocable license
to enter curtilage and conduct a knock and talk.  But like the government here, the
magistrate there didn't address the original meaning of the Fourth Amendment.
Instead, the court endorsed the rule the government proposes on the strength of a
hypothetical in which the police seek to investigate "an anonymous complaint that
a child [is] being abused on that property," suggesting that surely entry in these
circumstances would be important and good. *Id.* at *5.  Respectfully, though, this
seems at least as much a policy argument as a legal one — and one that fails even
on its own terms.  Credible allegations of ongoing child abuse, after all, would
qualify as exigent circumstances or support a warrant's issuance and thus permit
entry into the home, let alone the curtilage, without the need for any new and
irrevocable law enforcement license.  Seeming to recognize this much, the
magistrate in *Denim* proceeded to suggest, in the alternative, that the nature of the
crime being investigated shouldn't matter.  Even a wish to investigate the loss of
stolen goods, without sufficient evidence to support a warrant or exigent
circumstances, should be enough to permit authorities to enter curtilage whenever
they wish because "[a] crime is a crime." *Id.*  But under this logic officers would
be entitled to enter a home's curtilage (why not the home too?) so long as
probable cause (or maybe just reasonable suspicion?) exists to support the
investigation of any crime (even a misdemeanor?).  And that, of course, would
effectively undo the founders' and the Supreme Court's understanding that under
our Fourth Amendment a home and its curtilage are generally searchable only
with a warrant, exigent circumstances, or valid consent.

law enforcement agents than it does to other visitors, the government contends that No Trespassing signs aren't the proper way to revoke it. According to the government, a homeowner may avoid a knock and talk *only* by hiding in the home and refusing to answer the door. *See* App. Br. at 17-18 (relying on language in *King* indicating that an occupant in a knock and talk has "no obligation to open the door or to speak," 131 S. Ct. at 1862). Or *maybe*, as the government seemed to concede at oral argument, by opening the door and commanding officers to leave.

This argument is no more persuasive than the last. Actually, it's no different from the last. A homeowner who refuses to answer the door, or who opens it to say "go away," does so *after* the officers have already entered the home's front porch and knocked on the door — everything the implied license permits the officers to do. *See Jardines*, 133 S. Ct. at 1415. In the government's two scenarios, then, a homeowner hasn't *revoked* the license to enter the curtilage and knock at the front door so much as the officers have *exhausted* the terms of that license. The government's second argument thus really amounts only to an admission that the implied license has boundaries to its exercise, not an admission that the license may be revoked before its exercise. Indeed, the government's "new" argument seems just one more way of saying the same old thing — that homeowners are powerless to prevent the state's agents from entering their curtilage and conducting a knock and talk.

Unsurprisingly, this variation on the theme finds no more of a place in the Constitution than the theme itself. The government points to the Supreme Court's observation in *King* that a homeowner in response to a knock and talk *may* choose to refuse to answer the door or the questions put to him. 131 S. Ct. at 1862. But in endorsing that principle the Court hardly suggested that it was denying another — that it meant to deny the homeowner the power to revoke the implied license before visitors reach the front door. In fact and again, *Jardines* expressly confirmed the ancient rule that an officer's implied license to enter the curtilage is no different from a private person's. And as we've seen, that license is clearly revocable when it comes to officers and citizens alike. *See supra* at 8-9.

Notably, my colleagues appear to agree with all this too, for they leave the government's second alternative theory for affirmance, like its first, unendorsed — and unmentioned — in their opinions.[6]

---

[6] The government's brief does fleetingly allude to a third alternative theory for affirmance, but it is a good deal less plausible still and can be resolved quickly. The government suggests that the homeowner in our case didn't subjectively intend for her No Trespassing signs to exclude the police from investigating crimes on her property. And yet there's no evidence this intention was ever communicated to the police and — as the majority opinion rightly notes — the scope of the implied license cannot be measured by what the homeowner secretly and subjectively intended but must be measured by what an objective visitor would have perceived. *See* Maj. Op. at 11 n.5.

\*

Rather than reject the government's two arguments and call it a day, my colleagues choose to pursue two (more) alternative arguments for affirmance all their own. For its part, the concurrence appears to take the view that No Trespassing signs cannot revoke the implied license in the "residential context" unless they are coupled with a "fence or other physical obstacle." *See* Concurrence at 1-5. True, the concurrence seems to leave open the possibility that signs alone might do their intended work in some (sufficiently) rural setting. *See id.* at 3. But a careful look at its reasoning suggests a judgment that signs are categorically insufficient to revoke the implied license in the (undefined) "residential context." After all, the concurrence says that in the "residential context" plastering a No Trespassing sign to the center of your front door is not "particularly distinctive." *Id.* at 4. Even lining the path from the street to your porch with four (ten? twenty?) signs doesn't change the equation. *Id.* According to the concurrence, to revoke the implied license in the "residential context" we need "special facts" *in addition to* clearly posted No Trespassing signs — and fences, gates, and "other physical obstacle[s]" are the only "special facts" it identifies. *Id.* So much is required, we are told, because a sign posted on "a fence encircling a property imparts a different message" than a "sign standing alone." *Id.* To be sure, the concurrence doesn't say what type of "fence or other physical obstacle" might be necessary to inform neighborhood visitors that

-13-

they're unwelcome — and you might wonder how a quaint three-foot-high white picket fence might do the trick if twenty No Trespassing signs don't. But in the concurrence's judgment it does seem *some* sort of "fence or other obstacle" is required in the "residential context" to "clarif[y] to the reasonable visitor" that the license to enter the curtilage has been revoked. *Id.*

Respectfully, I have my doubts. Not only did the government fail to present this theory anywhere in this appeal, it expressly disavowed it, telling us repeatedly that walls and fences (yes, even moats) cannot keep its agents from entering the curtilage to conduct a knock and talk. And it's a pretty rare day when we pursue an argument for a party that the party has so avidly disowned. Neither am I persuaded that the concurrence's argument is some sort of dead-bang winner the parties and district court somehow just missed. After all, the concurrence provides no authority suggesting that some kind of physical obstacle was necessary to revoke the implied license at common law at the time of the Fourth Amendment's adoption. *See Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."). And rather than attempt an argument along those lines, the concurrence cites only a handful of contemporary decisions that, even on their own terms, do not support such a view. The first case the concurrence cites stands for the unremarkable proposition that a single sign on the side of a shed doesn't unambiguously apply to other portions of

-14-

the property.  *See State v. Hiebert*, 329 P.3d 1085, 1090 (Idaho Ct. App. 2014).  A second holds that a No Trespassing sign across a closed gate is *sufficient* to revoke without suggesting that something more than a No Trespassing sign is *necessary*.  *See State v. Christensen*, 953 P.2d 583, 587-88 (Idaho 1998).  And the last two cases the concurrence relies upon involve "open fields" doctrine and do nothing to suggest a meaningful line between signs and fences.  *See* Concurrence at 3-4.  In fact, these latter two cases suggest that signs and fences *together* are insufficient under the Fourth Amendment to prevent the government from searching open fields for evidence.  And that, of course, is because open fields — unlike curtilage — *aren't* protected by the Fourth Amendment, not because signs or fences lack force in areas that *do* fall within the Amendment's ambit.  *See Oliver*, 466 U.S. at 182 (noting that No Trespassing signs and fences "may be relevant to Fourth Amendment analysis in some contexts" but "cannot be decisive" for searches of open fields); *see also supra* at 4.

While the concurrence supplies no authority to support its judgment, there seems to be ample authority running the other way, suggesting that the common law at the time of the founding did *not* require a property owner to express his intent to revoke a license to enter in any particular way.  Indeed, all that was traditionally required were "*express words* . . . or . . . an act . . . indicating an intention to revoke."  3 H. Tiffany, Real Property § 836 (emphasis added); *see also supra* at 8 (citing additional authorities).  Nothing in this common law rule

-15-

of decision required *both* notice by word (a sign) *and* notice by deed (a fence). In fact, despite the relatively low literacy rates in mid-18th century England and early America, there appears to be considerable authority suggesting that posted signs or other types of published notice could suffice as a matter of law to ward off unwanted visitors.[7] What's more, a great many authorities applying the common law's ancient rule of decision have since recognized the capacity of No Trespassing signs to satisfy it. The Supreme Court in *Breard* (a decision on which *Jardines* itself relied) recognized that a homeowner may "bar[]" visitors from entering his property to knock at the front door "*by notice* or order." 341 U.S. at 626 (emphasis added). And to illustrate the kind of "notice" that will suffice, *Breard* expressly pointed to a collection of "trespass after warning" statutes endorsing the use of No Trespassing signs.[8] For their part, as well, most

_____

[7] *See* 2 Blackstone, *supra*, at \*214 ("Every trespass is *wilful*, where the defendant has notice, and is especially forewarned not to come on the land."); *Reynold v. Edwards*, (1794) 101 Eng. Rep. 408 (K.B.); 6 T.R. 11 (certifying a "wilful" trespass where landowner had given "general notice to all persons not to trespass on his lands"); *see also* Edward Christian, A Treatise on the Game Laws 96 (1817) (explaining that "[n]otice by a board" was sufficient to warn against trespass "if it could be proved that the defendant had read it"); Thomas A. Lund, *Early American Wildlife Law*, 51 N.Y.U. L. Rev. 703, 712-13 (1976) (describing the "presumption" in some early American jurisdictions that the absence of "posted notices" on unenclosed land was an invitation to hunt or fish).

[8] *See Breard*, 341 U.S. at 626 n.2 (citing "statutes collected" in *Martin v. City of Struthers*, 319 U.S. 141, 147 n.10 (1943)); *see also, e.g.*, Conn. Gen. Stat. § 6119 (1930) (entry prohibited by "clear and legible signs posted"); Md. Ann. Code, Art. 27, §§ 24, 286 (1939) (property "posted against trespassers in a conspicuous manner"); Nev. Comp. Laws § 10447 (1929) (land posted with "signs legibly printed or painted in the English language, warning persons not to

state legislatures have adopted laws indicating that entry in the face of conspicuously posted No Trespassing signs will support even *criminal* trespass actions.[9] And several courts have already specifically held (in conflict with our decision today) that No Trespassing signs like those at issue here *can* revoke the implied license to enter the curtilage when it comes to lay visitors and police

---

trespass"); Pa. Ann. Stat. § 4954 (1942) (land "prominently posted with printed notices that said land is private property, and warning all persons from trespassing thereon").

[9] *See, e.g.*, Okla. Stat. Ann. tit. 21, § 1835 (2015) (permitting the use of "PROPERTY RESTRICTED," "POSTED – KEEP OUT," "KEEP OUT," "NO TRESPASSING" or other "similar signs"); 3 W. LaFave, Subst. Crim. L. § 21.2 (2d ed.) (collecting state statutes). Such laws parallel the "wilful" trespass of Blackstone's day. When a judge certified a trespass as "wilful" due to "notice," the landowner could recover full costs. 2 Blackstone, *supra*, at *214.

officers alike.[10]  In response to this heap of pertinent authority, the concurrence

offers no comforting reply.[11]

Instead, in place of authority, the concurrence rests predominantly on

certain intuitions about what "reasonable people" think.  Attributing to me the

view that the posting of a No Trespassing sign "begins and ends" the Fourth

Amendment inquiry, the concurrence argues that there are surely at least *some*

situations in which a "reasonable person would not think a 'No Trespassing' sign

revoked the license."  Concurrence at 6; *see also id.* at 2 (disputing the

---

[10]  *See, e.g.*, *United States v. Clarkson*, No. 1:13-CR-44, 2015 WL 328350, at *4 (E.D. Tenn. Jan. 26, 2015) ("A police officer may . . . approach the front door to a residence to knock and ask questions provided the resident has not attempted to block access to the front door or taken other significant measures, such as 'No Trespassing' signs, to maintain his privacy."); *Powell v. State*, 120 So. 3d 577, 584 (Fla. Dist. Ct. App. 2013) ("The existence and extent of a license that would permit a 'knock and talk' depends on the circumstances; homeowners who post 'No Trespassing' or 'No Soliciting' signs effectively negate a license to enter the posted property."); *Commonwealth v. Ousley*, 393 S.W.3d 15, 29 (Ky. 2013) ("[J]ust as a private salesperson — absent no-solicitation signs, no-trespass signs, etc. — has implicit permission to approach the house to conduct business with the inhabitants, so too do the police."); *State v. Blackwell*, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010) ("Clearly, the presence of the 'No Trespassing' sign evinced . . . a revocation of the 'implied invitation' of the front door.").

[11]  The concurrence simply observes that contemporary state laws do not determine the contours of the Fourth Amendment's original meaning.  *See* Concurrence at 5.  But, respectfully, no one has suggested they do.  I've merely observed here that, at the time of the founding, the common law rule of decision for determining whether a license to enter had been revoked turned on the existence of notice, without regard to form.  And I have observed that a good many authorities, both then and since, have recognized an unsurprising application of that rule of decision — that posted signs can supply notice.

-18-

proposition that a sign can revoke the license "in every instance"). But, respectfully, the concurrence here presents a false choice. No one suggests that posting a No Trespassing sign "begins and ends" the Fourth Amendment inquiry or that a sign will succeed in revoking the implied license "in every instance." I do not doubt, for example, that often enough a No Trespassing sign — perhaps because of its distant or obscure placement — will fail to provide notice that the implied license to knock on the front door has been revoked. Neither does admitting that this straw man should be put to the flame do anything to help us resolve, one way or the other, the question we face in this case: whether multiple and clearly posted signs, along the path to and on the curtilage itself, can suffice to revoke the implied license without resort to fences or other obstacles.

When the concurrence reaches this question, it offers a different intuition. The concurrence suggests that "reasonable person[s]" do not consider No Trespassing signs, absent a fence or other obstacle, as speaking to the implied license to enter in the "residential context." In the concurrence's judgment, most people know that it's illegal to "trespass" on private property, and they also know that it generally *isn't* "trespassing" to walk up to the front door of a house and knock. So, the reasoning appears to go, "reasonable persons" visiting a residential neighborhood understand the particular words "no trespassing" to refer to conduct *other than* the exercise of the implied license. *Id.* at 2-3.

This intuitive appeal, though, seems to invite further problems of its own. First, as a matter of law, it disregards the common law rule of decision at the time of the founding and its many applications, then and now, suggesting that posted notice *can* suffice to warn off "reasonable" visitors. The Fourth Amendment is, after all, supposed to protect the people at least as much now as it did when adopted, its ancient protections still in force whatever our current intuitions or preferences might be. *See supra* at 15-18. Second, as a matter of fact, you can't help but wonder if millions of homeowners (and solicitors) might be surprised to learn that even a long line of clearly posted No Trespassing signs are insufficient to revoke the implied license to enter a home's curtilage — that No Trespassing signs have become little more than lawn art. Certainly the concurrence offers no evidence to support its intuition about social customs and the opposite intuition seems no less and maybe a good deal more defensible, especially in light of our common law heritage. Third, as a matter of logic, even on its own terms the concurrence's argument fails to sustain the conclusion that fences or other obstacles are necessary to revoke the implied license in the residential setting. Consider. If a single No Trespassing sign communicates only the already obvious fact that trespassing isn't permitted and says nothing that might be reasonably interpreted as revoking the implied license, how does the addition of a fence transform the message so drastically, as the concurrence supposes? And if adding a fence *does* transform the meaning of a single No Trespassing sign, then why

can't a large number of signs, collectively and strategically placed, have the same effect? The concurrence simply doesn't say. Along similar lines, if, as the concurrence suggests, No Trespassing signs cannot revoke the implied license because they use the word "trespassing" and that term has become encrusted with a very particular meaning that just doesn't speak to the implied license, what about signs that avoid the term and say instead Keep Out? Keep Off? Do Not Enter? Or how about this?

**THE IMPLIED LICENSE DISCUSSED**
**BY THE UNITED STATES SUPREME COURT**
**IN *BREARD v. ALEXANDRIA*, 341 U.S. 622 (1951)**
**AND *FLORIDA v. JARDINES*, 133 S. CT. 1409 (2013)**
**IS HEREBY REVOKED**

Respectfully, the concurrence's argument doesn't seem to suggest a rule requiring fences or other obstacles so much as a reason for differentiating between the precise text found on signs — in a way no statute or case I've found has seen fit to do — and simply avoiding the word "trespass" and its variants. And if that's the case, you have to wonder if following the concurrence's lead would do no more than invite a new cottage industry, one spitting out lawn signs with long and lawyerly (and no doubt less intuitive and commonsensical) messages instead of the tried and true "No Trespassing."

\*

The majority opinion — the only opinion to garner two votes in this case — offers yet another alternative theory for affirmance. It doesn't adopt the concurrence's suggestion that No Trespassing signs are categorically insufficient to revoke the implied license in a residential setting. Instead, the majority opinion seems to accept the possibility that signs *can* revoke the license in that setting or any other and presents a much more fact-bound argument about the insufficiency of the particular signs in this case.[12] Respectfully, though, the

---

[12] Before proceeding to this narrower and case-specific argument, the majority opinion does seem to intimate that there may be something to the concurrence's more categorical approach, and even proceeds to cite authorities that, it suggests, might support the position. *See* Maj. Op. at 12. But, once again, not one of these authorities turns out to endorse the notion that No Trespassing signs are categorically insufficient to revoke the implied license. *See, e.g.*, *State v, Christensen*, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at \*1, \*8 (Tenn. Crim. App. May 14, 2015), *appeal granted* (Tenn. July 14, 2015) (finding only that a single "small sign" that was "difficult to see," posted in a field next to a long, rural driveway, was insufficient to revoke); *United States v. Lubrin*, No. CR-2014-0056, 2015 WL 361796, at \*6 & n.7 (D.V.I. Jan. 28, 2015) (finding only that a "partial sign" on the corner of the property, far from the point of entry, was insufficient to revoke); *Hiebert*, 329 P.3d at 1091 (finding only that a single "small sign" on the side of a shed did not unambiguously apply to other portions of the property). I recognize that in *United States v. Jones*, No. 4:13CR00011-003, 2013 WL 4678229 (W.D. Va. Aug. 30, 2013), the district court did conclude that "the existence and volume of 'No Trespassing' signs is not dispositive" of the Fourth Amendment question, serving only as evidence of the homeowner's "desire for privacy." *Id.* at \*9. But not only did the court in *Jones* fail to grapple with the swathe of authority and argument discussed above, it stressed that when the officers approached the home — contrary to the facts here — the defendant "was unknown to them and was not the subject of a criminal investigation," thus leaving open the possibility that no search occurred that might trigger the Fourth Amendment in the first place. *Id.* at \*7. The other cases the majority opinion

-22-

majority opinion's alternative theory for affirmance is another one the district court never passed upon and the government never presented. Neither, again, is the argument so obviously correct that I believe we might confidently dispense with the adversarial process and adopt it without bothering to hear from the parties or district court.

Addressing the three signs leading to the front porch, the majority opinion begins by noting that they were posted on ground leading to the curtilage rather than on the curtilage itself. And this fact, it suggests, means a reasonable visitor wouldn't have understood them to forbid entry into the curtilage. *See* Maj. Op. at 12-13. But it's unclear why that conclusion follows from these facts. All three signs lined the path any visitor would follow (and the path the officers did follow) to reach the curtilage and front door. The signs came one upon the other, hard

cites address different questions altogether. *See, e.g.*, *United States v. Bearden*, 780 F.3d 887, 893 (8th Cir. 2015) (rejecting defendant's argument that officers had passed a No Trespassing sign because the district court's contrary factual finding was not clearly erroneous); *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 192-94 (4th Cir. 2015) (holding that officers exceeded the scope of the implied license without addressing the issue of revocation); *Pache v. State*, 413 S.W.3d 509, 511-12 (Tex. App. 2013) (discussing defendant testimony about the presence of a No Trespassing sign with no finding or analysis of its effect on the implied license); *City of Beatrice v. Meints*, 856 N.W.2d 410, 420-21 (Neb. 2014) (addressing entry into "urban lot" that had "no residence" and was thus an "open field"); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 787-88 (W.D. Tenn. 2015) (addressing entry into wooded area that was an "open field"); *Davis v. City of Milwaukee*, No. 13-CV-982-JPS, 2015 WL 5010459, at *8-13 (E.D. Wis. Aug. 21, 2015) (addressing whether it was "clearly established" that an administrative search of property surrounding an abandoned house in which the plaintiff had never lived violated the Fourth Amendment for purposes of qualified immunity).

-23-

and in short order, and near the bounds of the curtilage itself.  All were clearly visible and clearly unwelcoming.  And from this it's difficult to see how a reasonable visitor could have felt at liberty to venture into the curtilage. Especially when, as we've seen, *Breard* and a long line of cases have found similar signs sufficient to revoke the implied license in similar circumstances. *See supra* at 15-18.  The majority opinion creates a conflict with these authorities but discusses none of them.  And, like the concurrence, the only cases it does cite stand simply for the proposition that the Fourth Amendment is inapplicable to open fields, *see* Maj. Op. at 13-14, a proposition that's beside the point when we're faced with intrusions into constitutionally protected curtilage, *see supra* at 4, 15.  Neither, in all events, does the majority opinion's logic suffice to dispose of this case because at least one sign *was* undeniably on curtilage and clearly visible to those preparing to enter it.

To be sure, the majority opinion finds this last sign insufficient, too, if for a different reason.  The majority suggests that the terms of this particular sign were too ambiguous.  Maj. Op. at 14-15.  But in large bold letters the sign said this:

# POSTED
**PRIVATE PROPERTY
HUNTING, FISHING, TRAPPING, OR
TRESPASSING FOR ANY PURPOSE
IS STRICTLY FORBIDDEN
VIOLATORS WILL BE PROSECUTED**

The majority opinion emphasizes the sign's discussion of hunting, fishing, and trapping, and notes that those activities don't usually take place on a front porch. From this, the majority opinion reasons, the sign could have been reasonably interpreted by a visitor as forbidding him only from engaging in these recreational activities elsewhere on the property and not as speaking to his entry into the curtilage where the sign was posted. *Id.* at 15. But here again the majority opinion does not address the contrary tide of authority from *Breard* and beyond. *See supra* at 15-18. And even overlooking that problem, I would have thought it equally (or maybe even a good deal more) likely that a reasonable person — considering whether to enter a stranger's front porch and staring at a large "PRIVATE PROPERTY" sign forbidding "TRESPASSING FOR ANY PURPOSE" — would take it as directed at him and his activities rather than as directed only at someone interested in hunting or fishing somewhere else on the property. Especially after *Jardines* and *Breard* described the implied license to enter curtilage and knock at the front door as derived in part from the ubiquitous "knocker on the front door" and here (literally) a No Trespassing sign hung in its place. And especially when there's no evidence in the record that any hunting, fishing, or trapping took place in the yard of this home in the middle of town along a paved street. We do seem to invite quite a paradox when we suggest the first three signs are irrelevant to curtilage because they were not posted on curtilage and yet treat the final sign as irrelevant to curtilage even though it was.

-25-

And a paradox, too, when we suggest that a homeowner who posts a sign containing additional and illustrative warnings (about hunting, fishing, and trapping) should forgo the force of its central and express warning (no trespassing for *any* purpose).

Having said this much, I do appreciate the limits of the majority opinion's message. The sole controlling opinion in this case doesn't suggest that No Trespassing signs are categorically insufficient to revoke the implied license but suggests only that homeowners should be more punctilious with their choice and placement of signs than the homeowner here. Indeed, I understand the majority opinion as strongly implying that No Trespassing signs *will* do their job so long as they (1) are placed visibly on the curtilage itself and (2) don't contain surplus language about hunting and trapping. That much may invite a new chapter of cases forced to make fine judgments about the placement and content of signs. But it does not suggest that plain, simple, and appropriately placed No Trespassing signs are insufficient to revoke the implied license.

*

Besides those arguments my colleagues advance for the government, I can imagine still others the government might have pursued but didn't. For example, I don't doubt that an unlicensed entry into a home's curtilage can be licensed after the fact. Sometimes visitors take their chances in the face of a clear warning — sometimes they defy No Trespassing signs and hope the homeowner will

welcome them after all. And sometimes homeowners do, effectively affording the visitor a retroactive license. Maybe the government could have argued that its initially nonconsensual search in this case became a consensual and reasonable one thanks to the homeowner's after-the-fact consent. Maybe the government could successfully pursue just this tack in a good many knock and talk cases. *Cf. Cutler v. Smith*, 57 Ill. 252, 255 (1870) (affirming that "if defendant went to plaintiff's house to see her on business, and was allowed to enter, or did enter without force, this would be deemed a license"); 3 H. Tiffany, Real Property § 830 & n.24 (citing *Cutler* and other cases). But in this appeal the government expressly concedes that, if the officers violated the Fourth Amendment by entering the curtilage, any "subsequent consent" to the officers' presence in this case was insufficient "to purge any taint of the Fourth Amendment violation." App. Br. at 28; *id.* at 10.[13] Along similar but different lines, I can imagine the government arguing that even if a Fourth Amendment violation took place here, it acted at most negligently and in good faith so that as a matter of remedy

---

[13] On page 19 of its brief the government does suggest that Mr. Carloss "impliedly consented" to the officers' presence by failing to invoke the No Trespassing signs during their visit. But the government cites no legal authority, and it leaves the argument undeveloped as it quickly passes on to other things. When the government returns to the issue on page 28 it clearly concedes that if the officers violated the Fourth Amendment by trespassing onto the curtilage, Mr. Carloss's "subsequent consent is not remote enough" to purge the Fourth Amendment violation, seeming to concede the very argument it alluded to in passing nine pages earlier. In these circumstances, my colleagues are entirely correct to decline to pass on the argument.

-27-

suppression should not follow. *See Herring v. United States*, 555 U.S. 135, 147-48 (2009). But, again, the government makes no effort to pursue that kind of argument in this appeal. When it comes to these alternative grounds for affirmance, my colleagues decline to pursue arguments that the government failed to pursue for itself — and here I fully concur with their decision.

*

Whether in arguing that the state enjoys an irrevocable license to enter or in suggesting that No Trespassing signs are categorically insufficient to bar its agents, the government appears to be moved by the same worry: that if clearly posted No Trespassing signs can revoke the right of officers to enter a home's curtilage their job of ferreting out crime will become marginally more difficult. But obedience to the Fourth Amendment always bears that cost and surely brings with it other benefits. Neither, of course, is it our job to weigh those costs and benefits but to apply the Amendment according to its terms and in light of its historical meaning. Besides, it is hardly the case that following the Fourth Amendment's teachings would leave the government as bereft of lawful alternatives as it seems to suppose. The Amendment and the common law from which it was constructed leave ample room for law enforcement to do its job. A warrant will always do. So will emergency circumstances. After-the-fact consent may suffice if freely given. And, of course, there's no need for consent when officers search only open fields rather than curtilage. Neither is there need for

consent when officers enter curtilage for a non-investigative purpose. Our duty of fidelity to the law requires us to respect all these law enforcement tools. But it also requires us to respect the ancient rights of the people when law enforcement exceeds their limits. In this case the two arguments the government offers to justify its conduct can claim no basis in our constitutional tradition. Not one member of this panel endorses them. And, respectfully, I just do not see the case for struggling so mightily to save the government's cause with arguments of our own devise — especially when what arguments we are able to muster suffer so many problems of their own and the benefits of exposing them to at least a modest encounter with the adversarial process seem so obvious.

Respectfully, I dissent.